IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KELLY STANKIEWICZ, MD, FAAD, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 18 C 3823 |
| ) | |
| DUPAGE MEDICAL GROUP, ) | |
| LTD., d/b/a DUPAGE MEDICAL ) | Judge John Z. Lee |
| GROUP, an Illinois corporation, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Kelly Stankiewicz seeks a declaratory judgment, premised upon the Illinois Business Corporation Act, 805 ILCS 5/1.01 *et seq.*, that her previous employer, the DuPage Medical Group ("DMG"), failed to pay her a fair value for her shares in DMG upon her termination. DMG has moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons provided herein, DMG's motion [19] is denied.

**Factual and Procedural Background**[1]

Stankiewicz, a dermatologist, was employed by DMG from September 1, 2011, to the summer of 2017. Compl. ¶¶ 24–25, 77, ECF No. 1. In 2013, Stankiewicz acquired 11,000 of DMG's common shares, which the Shareholder Agreement

---

[1] When reviewing a motion to dismiss, the Court assumes the alleged facts in the complaint are true and draws all possible inferences in favor of Plaintiff. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). In addition to the complaint itself, on a motion to dismiss, the Court may consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

required DMG to repurchase upon termination of her employment. *Id.* ¶¶ 27–28; Pl.'s Ex. B, Shareholder Agreement §§ 1, 2(c).

Stankiewicz notified DMG on April 30, 2017, that she was voluntarily terminating her employment contract, effective July 31, 2017. Compl. ¶ 32. This notice complied with a provision of Stankiewicz's Employment Agreement requiring ninety days' notice prior to termination by either Stankiewicz or DMG. *Id.*; Pl.'s Ex. A, Employment Agreement § 3.1(c).

A month before Stankiewicz's chosen termination date, however, DMG's Board adopted an Equity Purchase Agreement to sell substantially all of DMG's equity in its subsidiary, DMG Practice Management Solutions LLC ("DMG-PMS"). Compl. ¶¶ 33–34. Stankiewicz received notice on July 7, 2017 of a shareholder meeting to be held on July 27, and information on her right to dissent from the transaction under the Illinois Business Corporation Act ("IBCA"), 805 Ill. Comp. Stat. 5/1.01 *et seq*. *Id.*; Pl.'s Ex. D, Notice of Shareholder Meeting. On July 24, Stankiewicz asked her supervisor to extend her employment until August 31, 2017. Compl. ¶ 58. Stankiewicz also reviewed a presentation from DMG's management about the proposed $1.45 billion transaction, which projected shareholder income from the sale "in the hundreds of millions of dollars." *Id.* ¶¶ 64–65.

The day before the shareholder meeting, Stankiewicz emailed DMG's CEO, Michael Kasper, purporting to exercise her right to dissent from the sale pursuant to 805 Ill. Comp. Stat. 5/11.65. *Id.* ¶ 66; *see* Pl.'s Ex. G. At the time of the vote, 3 out

of 409 shareholders, including Stankiewicz, dissented from the sale. Compl. ¶ 73.

Between July 28 and July 30, Stankiewicz twice sought confirmation from Kasper that her employment had been extended to August 31, 2017. *Id.* ¶ 76. Kasper responded on July 31 that DMG had planned for her transition and that her employment was ending that day as originally planned. *Id.* ¶ 77, Pl.'s Ex. I. Accordingly, Stankiewicz alleges that "[d]espite DMG's previous agreement to continue [her] employment through August 31, 2017, DMG involuntarily terminated [her] employment on July 31, 2017, without prior notice or cause." Compl. ¶ 78.

On August 1, 2017, Stankiewicz received an $11,000 deposit from DMG purporting to repurchase her shares per the Shareholder Agreement. *Id.* ¶ 81. Stankiewicz returned a check of the same value to DMG on August 4, demanding a *pro rata* redemption of her shares out of the $1.45 billion merger. *Id.* ¶ 82. The sale of DMG-PMS was later consummated on August 15. *Id.* ¶ 83.

Stankiewicz seeks a declaratory judgment that she was entitled to receive the fair value of her shares as determined at the time of the DMG-PMS sale. DMG has moved to dismiss the claims for lack of standing under Rule 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6).

## Legal Standard

I. **Rule 12(b)(1)**

Under Rule 12(b)(1), a defendant may move to dismiss claims over which the federal court lacks subject-matter jurisdiction, including claims for which the parties

lack standing. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009); *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999). In ruling on a Rule 12(b)(1) motion, the Court must accept as true all well-pleaded facts and may look beyond the jurisdictional allegations to evidence submitted on the issue of subject-matter jurisdiction. *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 625 (7th Cir. 2007). The Court must also draw all reasonable inferences in the plaintiff's favor. *Id.*

Article III standing requires the plaintiff to show a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 678 (2016) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Article III "injury-in-fact" is a concrete and particularized, actual or imminent invasion of a legally protected interest. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "[I]f the [litigant does] not have standing, the Court is without authority to consider the merits of the action." *Swan v. Bd. of Educ. of City of Chi.*, 956 F. Supp. 2d 913, 918 (N.D. Ill. 2013).

## II.     Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

4

Additionally, when considering motions to dismiss, the Court accepts "all well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). As such, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## Analysis

The parties' positions hinge on a determination of Stankiewicz's employment and shareholding status at the time of the DMG-PMS sale and her corresponding right to receive an appraisal of her share value under 805 Ill. Comp. Stat. 5/11.70. Stankiewicz contends that she extended her employment until after the sale occurred, thus preserving her right to dissent. In the alternative, she contends that her right to dissent and receive an appraisal survived her termination on July 31.

For its part, DMG argues that Stankiewicz's employment was terminated on July 31, thereby triggering the repurchase provision of the Shareholder Agreement and voiding Stankiewicz's ability to receive an appraisal as a dissenting shareholder at the time of the later sale. Further, DMG contends, because it already paid Stankiewicz $11,000 for her shares pursuant to the Shareholder Agreement, she has suffered no injury in fact for purposes of standing.

5

I. **Standing**

Standing pertains to the court's jurisdiction and must be addressed before discussing the merits of the 12(b)(6) motion. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception.'"). Nonetheless, "[i]f a defendant's Rule 12(b)(1) motion is an indirect attack on the merits of the plaintiff's claim, the court may treat the motion as if it were a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted." *Peckmann v. Thompson*, 966 F.2d 295, 297 (7th Cir. 1992).

In this case, DMG's 12(b)(1) arguments are intertwined with its contentions with respect to the merits of the case. DMG contends that it rightfully paid Stankiewicz the value of her shares required by the Shareholder Agreement, and thus Stankiewicz has suffered no injury in fact. This argument ultimately rests on the plausibility of Stankiewicz's allegations under the IBCA and the applicability of the Shareholder Agreement. Since the merits of the case and the Court's jurisdiction are inseparable, the Court will turn to the parties' substantive arguments. *See Peckmann*, 966 F.2d at 297; *Brown v. Club Assist Rd. Serv. U.S., Inc.*, No. 12 CV 5710, 2013 WL 5304100, *4 (N.D. Ill. Sept. 19, 2013).

II. **Stankiewicz's Termination**

The gist of Stankiewicz's claim is that DMG purported to terminate her on July 31 (in violation of the ninety-day notice provision and presumably knowing that the

6

sale of DMG-PMS was imminent), when in fact she and DMG had agreed that she would remained employed with the company until August 31, 2017. This is the fulcrum upon which the entire case totters.

Now DMG argues that it doesn't matter whether its decision to terminate Stankiewicz on July 31 was legally justified, because the Shareholder Agreement provides that an employee's shares are automatically redeemed upon termination "for any reason." But surely, this argument—though superficially appealing—proves too much. After all, if this were the case, DMG could terminate whomever it wanted, whenever it wanted, for whatever reason it wanted (whether legally permissible or not), thereby triggering automatic redemption of an employee's shares at any time of its own choosing. Such a nonsensical reading of the contract cannot stand. *See Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers Warehouse, Inc.*, 902 N.E.2d 1178, 1190 (Ill. App. Ct. 2009) ("Courts will construe a contract reasonably to avoid absurd results.") (citing *Health Prof'ls, Ltd. v. Johnson*, 791 N.E.2d 1179, 1193 (Ill. App. Ct. 2003)).

That said, it is unclear why Stankiewicz relies solely on a claim under the IBCA (a declaratory judgment action, no less), rather than also asserting common law claims, such as breach of contract. *See, e.g., Hess v. Kanoski & Assocs.*, 668 F.3d 446, 453 (7th Cir. 2012) (explaining that breach of a termination-notice provision "requires the [employer] to pay [Plaintiff] whatever compensation [she] was due during that time"); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 359–61 (7th Cir. 1992)

7

(addressing the issue of whether an employee was terminated improperly without cause or notice as a question of breach of contract). To the extent that her ultimate goal is to recover the difference between the value of her shares post-sale and $11,000, she presumably could obtain this amount in damages.

In any event, because the date of Stankiewicz's termination for purposes of the Shareholder Agreement is a hotly contested issue, it must be left for discovery, and DMG's motion to dismiss is denied.

There are two final matters that should be addressed. First, Stankiewicz contends that, even if her employment had been properly terminated on July 31, 2017, the value of her shares still should have been determined pursuant to the procedures for dissenting shareholders set out in 805 Ill. Comp. Stat. 5/11.70(d). This is incorrect.

> Section 5/11.70(d) provides:
>
> A shareholder who makes written demand for payment . . . retains all other rights of a shareholder until those rights are cancelled or modified by the consummation of the proposed corporate action. Upon consummation of that action, the corporation shall pay to each dissenter who transmits to the corporation the certificate or other evidence of ownership of the shares the amount the corporation estimates to be the fair value of the shares, plus accrued interest, accompanied by a written explanation of how the interest was calculated.

805 Ill. Comp. Stat. 5/11.70(d). The first sentence of this subsection might be read to allow a shareholder to "retain" her appraisal right as long as she makes a written demand, no matter whether she subsequently ceases to be a shareholder. Nonetheless, the language of the second sentence presumes that the shareholder still

*owns* the shares upon the "consummation of the proposed corporate action," as the shareholder must "transmit[] to the corporation" at that time "the certificate of other evidence of ownership of the shares." *Id.* Other sections of the statute are in accord with this conclusion; for instance, 11.70(j)(1) provides that fair value should be established "immediately before the consummation of the corporate action to which the dissenter objects."

The Illinois Appellate Court has reached the same conclusion. In *Hunter v. Vercellotti*, the court observed:

> [T]he statutory procedure [of 11.70] clearly contemplates a scenario in which the dissenting shareholder demands payment. The corporation in turn issues an opinion as to the estimated value of the shares and a commitment to pay the shareholder that amount *upon the shareholder transmitting evidence of ownership to the corporation* . . . . This of course assumes the shareholder *will be amenable to transferring evidence of ownership in the shares* prior to receiving what the shareholder believes is the full value of the shares.

649 N.E.2d 557, 560 (Ill. App. Ct. 1995) (emphasis added); *see also Brynwood Co. v. Schweisberger*, 913 N.E.2d 150, 169 (Ill. App. Ct. 2009) ("[T]he 'consummation' or the completion of the corporate act . . . correspondingly triggers the corporation's legal obligation to pay the dissenter the fair value of his or her shares."). For a shareholder to transfer evidence of ownership before receiving the fair value of her shares, it is necessary for her to *own* those shares. Accordingly, if a shareholder no longer has an ownership right to shares at the time the transaction is consummated, the shareholder cannot receive a fair value for such shares under the dissenter appraisal process provided by 850 Ill. Comp. Stat. 5/11.70. As DMG points out, a

9

contrary interpretation would be absurd—for instance, a shareholder could sell shares to a third party after providing notice of intent to dissent, and then obtain double recovery from the company in the form of "fair value" under the IBCA.

Here, if Stankiewicz's employment were deemed to have been terminated for purposes of the Shareholder Agreement on July 31, 2017, her shares would have been automatically redeemed at that time and the agreement's valuation provision would control. *See* Shareholder Agreement §2(c) ("The Shares shall be automatically redeemed by [DMG] and shall no longer be deemed outstanding for any reason upon the occurrence of . . . [t]he termination of employment of the Shareholder with [DMG] for any reason."). A similar result occurred in *Dolezal v. Plastic & Reconstructive Surgery, S.C.*, 640 N.E.2d 1359, 1366–67 (Ill. App. Ct. 1994). There, the Illinois Appellate Court held that a stock repurchase agreement entered into by a physician and former employee-shareholder of the defendant "c[a]me into play" upon the physician's termination. *Id.* Because the physician's shares were repurchased under the agreement, he no longer had standing to petition the court for relief otherwise available to a shareholder by statute. *Id.*

Second, Stankiewicz insists that the "fair value" of shares cannot be set by agreement, and that Courts are required to undertake a determination of whether the purchase price is ultimately equitable. That is incorrect. Stock repurchase agreements—including those that set a buyback price—are routinely enforced. *See, e.g., id.* at 1366–67 (upholding the validity of a stock repurchase agreement despite

10

the plaintiff's attempt to petition the court to dissolve the company or appoint a receiver); *Harris Tr. & Sav. Bank v. Hirsch*, 445 N.E.2d 1236 (Ill. App. Ct. 1983) (concluding that a stock repurchase agreement setting repurchase price was ambiguous, but otherwise assuming it could be valid); *Bird Chevrolet Co. v. Jackson*, 336 N.E.2d 487 (Ill. App. Ct. 1975) (upholding a stock repurchase agreement setting a valuation scheme); *see also Coleman v. Taub*, 638 F.2d 628, 629 (3d Cir. 1981) (upholding the validity of an employee-shareholder's repurchase agreement setting mechanisms for determining the value of the repurchase, despite the fact that the employee was terminated pending a merger transaction).

The key to the case is whether DMG's decision to terminate Stankiewicz on July 31, 2017 was consistent with the parties' agreements, or whether the parties had an enforceable agreement to postpone her termination date to August 31, 2017. This issue can only be decided after discovery.

## Conclusion

For the reasons stated, DMG's motion to dismiss [19] is denied.

**IT IS SO ORDERED.**   ENTERED   3/8/19

*/s/ John Z. Lee*

_____

**John Z. Lee**
**United States District Judge**