**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KELLY STANKIEWICZ, MD, FAAD | |
| Plaintiff, | Case No. 18-3823 |
| | Hon. John Z. Lee |
| v. | |
| DU PAGE MEDICAL GROUP, LTD., d/b/a DUPAGE MEDICAL GROUP, an Illinois corporation, | |
| Defendant. | |

**DEFENDANT DU PAGE MEDICAL GROUP, LTD.'S MEMORANDUM OF LAW IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Steven S. Scholes (# 6191220)
Peter B. Allport (# 6295762)
Sean Koller (# 6324181)
MCDERMOTT WILL & EMERY LLP
444 W. Lake Street
Suite 4000
Chicago Illinois  60606
Tel: (312) 372-2000
Fax: (312) 984-7700
sscholes@mwe.com
pallport@mwe.com
sekoller@mwe.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

FACTUAL SUMMARY ........................................................................................... 2

    A.      DMG. ............................................................................................ 2

    B.      DMG and Stankiewicz Enter Into a Written Employment
              Agreement. ................................................................................... 3

    C.      DMG and Stankiewicz Enter into the Shareholder Agreement. .............................. 4

    D.      Stankiewicz Resigns Voluntarily from DMG to Move to Park City,
              Utah. ............................................................................................ 4

    E.      DMG Enters into the Purchase Agreement to Sell Its Interest in
              DMG PMS. ................................................................................... 6

    F.      Stankiewicz Surreptitiously Takes Steps to Attempt to Cause DMG
              to Extend Her Resignation Date So That She Can Benefit from the
              Transaction. ................................................................................. 6

    G.      DMG's C-Suite Discovers Stankiewicz's Plan. ....................................... 7

    H.      DMG's CEO Informs Stankiewicz that She Cannot Extend Her
              Resignation Date and Her Resignation Takes Effect on July 31,
              2017. ............................................................................................ 8

    I.      DMG Tenders Stankiewicz Payment for the Fair Value of Her
              Shares Pursuant to the Terms of the Shareholder Agreement. ................................ 9

    J.      Stankiewicz's Complaint. ............................................................... 9

LEGAL STANDARD ............................................................................................. 9

ARGUMENT ......................................................................................................... 10

I.      The IBCA Requires an Individual to Remain a Shareholder of a Corporation Through the
     Consummation Date of the Transaction to Perfect a Right to Dissent. ............................. 10

II.      Stankiewicz Did Not Have the Right to Dissent to the Transaction Because She Was Not
     a Shareholder When the Transaction Closed .................................................... 11

    A.      Stankiewicz's Voluntary Resignation of Employment on July 31,
              2017 Resulted in the Redemption of Her Shares. .................................................. 11

    B.      DMG Never Agreed to Extend Stankiewicz's Resignation Date. ......................... 12

i

## TABLE OF CONTENTS
### (continued)

Page

1.    The Record Establishes That No Agreement Between DMG and Stankiewicz To Extend Her Resignation Date Ever Existed. ................................................................................ 12

2.    The Record Establishes That No One With Authority to Bind DMG Ever Agreed to Extend Stankiewcz's Resignation Date. ........................................................................... 14

      a.    *Ruggio, Sagredo, and McGuire Did Not Have Express Authority.* ......................................................... 16

      b.    *Ruggio, Sagredo, and McGuire Did Not Have Implied Authority.* ......................................................... 16

      c.    *Ruggio, McGuire, and Sagredo Did Not Have Apparent Authority.* ....................................................... 17

            (i)    *Stankiewicz Possessed Actual Knowledge of the Fact that Ruggio, Sagredo, and McGuire Did Not Have the Authority to Extend Her Resignation Date.* ............................................... 18

            (ii)    *DMG Never Held Out Ruggio, McGuire, or Sagredo as Possessing Authority.* ...................................... 20

            (iii)    *Stankiewicz Failed To Make Any Inquiry Into the Status of the Authority Ruggio, Sagredo, or McGuire Possessed.* ...................................... 20

            (iv)    *Stankiewicz Cannot Establish Detrimental Reliance* ............................................................... 21

3.    The Statute of Frauds Bars Any Oral Agreement With Respect to the Extension of Stankiewicz's Resignation Date. ........................................................................................ 22

C.    DMG Possessed the Ability to Redeem Stankiewicz's Shares At Any Time After Stankiewicz Tendered Her Notice of Resignation. ..................... 23

III.    The Doctrine of Unclean Hands Bars Stankiewicz's Claim. .............................. 24

CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*,
326 Ill. App. 3d 126 (2d Dist. 2001) ..............................................................16, 17

*America's Money Line, Inc. v. Coleman*,
360 F.3d 782 (7th Cir. 2004) ...................................................................................24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................9

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
492 F.3d 1192 (10th Cir. 2007) ..............................................................................12

*Brynwood Co. v. Schweisberger*,
393 Ill. App. 3d 339 (2d Dist. 2009) .......................................................................11

*Chase v. Consolidated Foods Corp.*,
744 F.2d 566 (7th Cir. 1984) ...........................................................................*passim*

*Classic Fire & Marine Ins. Co. v. Illinois Ins. Exch.*,
No. 97 C 1256, 1997 WL 767290 (N.D. Ill. Dec. 3, 1997) ....................................21

*Cohn v. Guaranteed Rate Inc.*,
130 F. Supp. 3d 1198 (N.D. Ill. 2015) .....................................................................10

*Cove Mgt. v. Aflac, Inc.*,
2013 Ill. App. (1st) 120884 (1st Dist. 2013) .....................................................*passim*

*Dickens v. Quincy College Corp.*,
245 Ill.App.3d 1055 (4th Dist. 1993) .......................................................................22

*Do It Best Corp. v. Passport Software, Inc.*,
2005 WL 743083 (N.D. Ill. Mar. 31, 2005) ............................................................22

*Eurich v. Korean Foundation, Inc.*,
31 Ill. App. 2d 474 (1st Dist. 1961)..........................................................................12

*Gambino v. Blvd. Mortg. Corp.*,
398 Ill. App. 3d 21 (1st Dist. 2009)..........................................................................18

*Gras v. Clark*,
46 Ill. App. 3d 803 (2d Dist. 1977) ..........................................................................13

*Gupta v. Morgan Stanley*,
No. 18-3584, 2019 WL 3886452 (7th Cir. 2019) ..................................................... 13

*Johnson v. Cambridge Indus., Inc.*,
325 F.3d 892 (7th Cir. 2000) ................................................................................... 10

*Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*,
No. 15 C 1785, 2018 WL 2072858 (N.D. Ill. May 3, 2018) ............................... 18, 21

*MacLean v. City of St. Petersburg*,
194 F. Supp. 2d 1290 (M.D. Fla. Mar. 18, 2002) .................................................... 13

*Malcak v. Westchester Park Dist.*,
754 F.2d 239 (7th Cir. 1985) ................................................................................... 15

*Marcus & Millchap Real Estate Inv. Services Inc. v. Sekulovski*,
No. 07 C 5369, 2009 WL 1543710 (N.D. Ill. June 2, 2009) .................................... 15

*Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................................................................. 9

*McInerney v. Charter Golf, Inc.*,
No. 01 C 7674, 176 Ill. 2d 482 (1997) ...................................................................... 22

*Melena v. Anheuser-Busch, Inc.*,
219 Ill. 2d 135 (Ill. 2006) ......................................................................................... 13

*Mittelstaedt v. Gamla-Cedron Orleans, LLC*,
No. 12 C 5131, 2012 WL 6188548 (N.D. Ill. Dec. 12, 2012) .................................. 24

*Orix Credit Alliance v. Taylor Mach. Works*,
125 F.3d 468 (7th Cir. 1997) .............................................................................. 16, 17

*Packers Trading Co v. CFTC*,
972 F.2d 144 (7th Cir. 1992) .............................................................................. 24, 25

*Siena at Old Orchard Condo. Ass'n v. Siena at Old Orchard, L.L.C.*,
2017 IL App (1st) 151846 (1st Dist. 2017) ........................................................ 14, 20

*Smith v. DeTar Hosp.*,
No. V-10-83, 2012 WL 2871673 (S.D. Tex. July 11, 2012) .................................... 13

*State Bank of Geneva v. Sorenson*,
167 Ill. App. 3d 674 (2d Dist. 1988) ........................................................................ 24

*Tate v. Wabash Datatech, Inc.*,
147 Ill. App. 3d 230 (2d Dist. 1986) ........................................................................ 12

iv

*Trippe Mfg, Co. v. Am. Power Conversion Corp.*,
    46 F.3d 624 (7th Cir. 1995) ........................................................................... 10

*Wells Fargo Bus. Credit v. Hindman*,
    734 F.3d 657 (7th Cir. 2013) .................................................................... 15, 16

*Wilkerson v. Springfield Public School Dist., No. 186*,
    40 Fed. Appx. 260 (7th Cir. 2002) ............................................................... 13

*Wisconsin Elec. Employees Health & Welfare Plan v. KMS Elec., LLC*,
    No. 14–CV–521, 2015 WL 4487072 (E.D. Wis. Jul. 23, 2015) ................... 15

*Zusy v. Int'l Med. Group, Inc.*,
    500 F. Supp. 2d 1087 (S.D. Ind. 2007) ........................................................ 22

**Statutes**

740 ILCS 80/1 ....................................................................................................... 22

805 ILCS 5/8.05(a) ................................................................................................ 15

805 ILCS 5/11.65 ........................................................................................ 1, 10, 11

28 U.S.C. § 2201 .................................................................................................... 10

805 ILCS 5/11.70 .............................................................................................. 1, 11

**Other Authorities**

Fed. R. Civ. P. 56 ..................................................................................................... 9

Fed. R. Civ. P. 56(e) .............................................................................................. 10

Local Rule 56.1 ........................................................................................................ 2

### INTRODUCTION

Sections 11.65 and 11.70 of the Illinois Business Corporations Act (the "IBCA") provide a shareholder of an Illinois corporation with a right to dissent from, and obtain payment for the "fair value" of his or her shares in the corporation, in the event of the "consummation of a sale, lease, or exchange of all, or substantially all" of the corporation's property or assets. In this case, Plaintiff Kelly Stankiewicz ("Stankiewicz") seeks the entry of a declaratory judgment that requires Defendant Du Page Medical Group, Ltd. ("DMG") to compensate her for the "fair value" of her alleged equity interest in DMG because Stankiewicz allegedly exercised this statutory right and dissented to DMG's sale of its equity interest in DMG Practice Management Solutions LLC (the "Transaction"). However, the IBCA only conveys a statutory right to dissent to individuals who are shareholders in the corporation on the date the relevant corporate transaction is consummated. Therefore, the Court should enter judgment in DMG's favor because the record establishes that Stankiewicz had resigned from DMG, and was no longer a shareholder, when the Transaction closed. She did not have the right to dissent.

Stankiewicz entered into a Shareholder Agreement (the "Shareholder Agreement") with DMG when she acquired her shares. The Shareholder Agreement governed the ownership of shares in DMG and mandated the automatic redemption of Stankiewicz's shares when her employment ended. Stankiewicz resigned voluntarily from DMG on May 1, 2017. Her last date of employment was July 31, 2017. As a result, DMG redeemed her shares by July 31, 2017. Thus, Stankiewicz had no right to dissent to the Transaction because the Transaction did not close until August 15, 2017.

In an effort to avoid this result, Stankiewicz now claims that DMG terminated her involuntarily on July 31, 2017 (despite the tender of her notice of resignation) because DMG had

1

allegedly agreed to extend her resignation date until August 31, 2017.   In ruling on DMG's

motion to dismiss, the Court stated that:

> The gist of Stankiewicz's claim is that DMG purported to terminate her on July
> 31 . . . when in fact she and DMG had agreed that she would remain employed
> with the company until August 31, 2017.  This is the fulcrum upon which the
> entire case totters . . . The key to the case is whether DMG's decision to terminate
> Stankiewicz on July 31, 2017 was consistent with the parties' agreement, or
> whether the parties had an enforceable agreement to postpone her termination
> date to August 31, 2017.

Docket Entry ("D.E.") 48, pp. 6-7, 11.  Discovery has now resolved this issue conclusively.

DMG did not terminate Stankiewicz.  She resigned voluntarily.  DMG never entered into an

enforceable agreement to extend Stankiewicz's employment to August 31, 2017.  DMG refused

Stankiewicz's offer to extend her resignation date.  No one with authority to act on DMG's

behalf ever entered into an agreement with Stankiewicz.  The statute of frauds and the doctrine

of unclean hands also bars the enforcement of any agreement.  Indeed, Stankiewicz's own

testimony confirmed that there is no merit to her claim: "Q. And DMG did not fire you, correct?

A. *Correct."*  The Court should grant summary judgment in DMG's favor as a result.

## FACTUAL SUMMARY

### A.    DMG.

DMG is the largest independent, multi-specialty physician group in the Chicagoland area.

*See* D.E. 22, DMG's Answer, ¶ 22. A physician Board of Directors (the "Board") manages

DMG's business and affairs.  SOF ¶ 6.[1]  Dr. Paul Merrick serves as the President of the Board.

SOF ¶ 7.   The Board possesses the exclusive authority, subject to specific written delegations, to

make employment decisions on behalf of DMG with respect DMG's physicians.  SOF ¶ 8.

---

[1] References made to DMG's Local Rule 56.1 Statement of Undisputed Material Facts are referred to herein as
("SOF ¶").  For purposes of context, DMG also includes facts that are not material in this summary.

DMG also has a contractual relationship with Midwest Physician Administrative Services ("MPAS"), pursuant to which MPAS provides certain managerial and administrative functions to DMG.  SOF ¶ 9.  The Board appointed certain MPAS employees to executive management positions within DMG.  SOF ¶ 10.  Michael Kasper served as DMG's CEO, Michael Pacetti served as DMG's CFO, and Dennis Fine served as DMG's as COO in July 2017.  *Id*.  Employees referred to Kasper, Pacetti, Fine, and Merrick as the "C-Suite."  SOF ¶ 11.  The Board delegated certain powers over personnel decisions with respect to physicians to Kasper.  *Id*.

### B. DMG and Stankiewicz Enter Into a Written Employment Agreement.

DMG hired Stankiewicz in July 2011 as a dermatologist in its CityGate office in Naperville.  SOF ¶ 13.  Merrick, Kasper, and Fine each interviewed Stankiewicz before DMG hired her.  *Id*.  DMG and Stankiewicz entered into a written employment agreement that set forth the terms and conditions of Stankiewicz's employment (the "Employment Agreement").  *Id.* The Employment Agreement established Stankiewicz's duties and responsibilities, procedures for resignation and termination, and dictated the individuals with whom Stankiewicz must communicate regarding any actions taken under the Employment Agreement.  SOF ¶ 14. With respect to resignation and termination, the Employment Agreement provides that:

> Either party may terminate this Agreement with or without cause upon ninety (90) days prior written notice.

SOF ¶ 15.  The Employment Agreement also required Stankiewicz to contact either DMG's President or CEO if she sought to effect any change regarding her employment, such as to attempt to rescind a resignation.  SOF ¶ 16.  Specifically, Section 12.1 provides that:

> All notices or communications to the Medical Group shall be delivered or mailed to the *attention of its President and its Chief Executive.*

*Id.*  (emphasis added).  Stankiewicz understood this provision to require her to seek permission from Dr. Merrick and Kasper in order to rescind or modify a resignation date.  SOF ¶ 17.

3

Indeed, witnesses testifed consistently that physicians needed to seek approval from Dr. Merrick and Kasper in order to effect any change in their terms and conditions of employment, including any rescission of a notice of resignation.  SOF ¶ 12.

### C.  DMG and Stankiewicz Enter into the Shareholder Agreement.

On or around September 1, 2013, DMG and Stankiewicz entered into the Shareholder Agreement, pursuant to which Stankiewicz acquired 1000 Class A common shares in DMG. SOF ¶19.  Section 2 of the Shareholder Agreement provides, in relevant part, that Stankiewicz's:

> Shares *shall be automatically redeemed* by the Clinic and shall no longer be deemed outstanding for any reason upon the occurrence of any of the following events . . .
>
> (c) The *termination of employment* of the Shareholder with the Clinic *for any reason*;
>
> (d) The decision of the Shareholder to terminate his interest in the Clinic as a Shareholder.

SOF ¶ 20.  The Shareholder Agreement calculates the redemption price as the "original purchase price [of the shares] plus the amount of any subsequent additional capital contributions made by such Shareholder to the Clinic."  SOF ¶ 21.  The value of the shares do not appreciate.  *Id*.  The Shareholder Agreement also prohibits any disposition of shares by means other than those set forth in the agreement.  SOF ¶ 22.  Stankiewicz purchased her shares in DMG for $1,000 and made an initial capital contribution of $10,000 for a total amount paid to DMG of $11,000.  SOF ¶ 23.  Stankiewicz did not make any subsequent additional capital contributions.  *Id*.

### D.  Stankiewicz Resigns Voluntarily from DMG to Move to Park City, Utah.

In December 2016, Stankiewicz purchased a home in Park City, Utah.  SOF ¶ 24.  She decided to move to Park City in or around February 2017.  SOF ¶ 25.  Stankiewicz's husband began working full time in Park City in 2017.  SOF ¶ 26.  On April 24, 2017, Stankiewicz emailed Susan Ruggio to inform Ruggio that Stankiewicz intended to resign from DMG.  SOF ¶

4

29.  Ruggio served as the practice manager for the CityGate location.  SOF ¶ 27.  Ruggio's

duties were to manage the non-physician staff at her practice and to assist physicians with

meeting financial and quality/patient satisfaction targets.  *Id*.  Ruggio did not have authority to

make decisions with respect to the employment of a physician at DMG, such as the authority to

hire a physician, terminate a physician, or extend a physician's resignation date.  *Id*.  In her

email, Stankiewicz stated, in relevant part, that:

> I would like to send out emails to DMG headquarters and the office sometime this
> week . . . Who should I address this email to in headquarters? . . .
>
> To DMG headquarters: It is with mixed emotions that I inform you of my exit
> from DuPage medical group.  I am available to complete my duties here until the
> end of July.  After this, my family and I will be moving to Park City, UT.

SOF ¶ 29.  When Stankiewicz referred to "DMG headquarters," she was referring to DMG's

"senior management."  *Id*.  Ruggio responded:

> As far as DMG I would say Dennis and Mike Kasper.  Do you have any
> obligation to the board?  Maybe Dr. Merrick would cover that portion.  I would
> maybe check with Dr. Bhatia on that as I'm not sure.

SOF ¶ 30.[2]

On May 1, 2017, Stankiewicz voluntarily tendered her notice of resignation with an

effective date of July 31, 2017.  SOF ¶ 31.  Specifically, Dr. Stankiewicz stated:

> I would like to inform you of my exit from DuPage medical group.  I am available
> to complete my duties here until the end of July.  After this, my family and I will
> be moving out of state.  Please let me know if you have any questions.

*Id.,* at Ex. 2-E.  Dr. Ashish Bhatia subsequently tendered the notice on Stankiewicz's behalf to

DMG's C-Suite.  SOF ¶ 32.  Dr. Merrick and Mr. Kasper were made aware of Stankiewicz's

notice of resignation.  SOF ¶ 33.  DMG accepted Stankiewicz's resignation.  *Id*.

---

[2] Ruggio testified that "Dennis" is a reference to Dennis Fine, DMG's COO.  *See* Ex. 1-H, p. 35:21-36:7.

DMG then began to prepare for Stankiewicz's departure. DMG informed Stankiewicz's patients that Stankiewicz had resigned from DMG. SOF ¶ 35. DMG hired two new dermatologists. SOF ¶ 36. DMG blocked Stankiewicz's schedule and rescheduled patients who had already made appointments. SOF ¶ 38. DMG informed hospitals and health plans of Stankiewicz's resignation. SOF ¶ 37. DMG also provided Stankiewicz with notice that she would lose access to DMG's computer system and electronic medical records system on July 31. SOF ¶ 40. Stankiewicz understood that she had decided to terminate her interest in DMG by tendering her resignation because only DMG employees can own shares in DMG. SOF ¶ 34.

### E. DMG Enters into the Purchase Agreement to Sell Its Interest in DMG PMS.

On June 30, 2017, DMG entered into an equity purchase agreement pursuant to which DMG agreed to sell its interest in DMG Practice Management Solutions LLC ("DMG PMS") to an affiliate of Ares Management, L.P. SOF ¶ 41. DMG informed its shareholders that they would receive bonuses once the Transaction closed. *See* D.E. 1, ¶ 47. DMG also told the shareholders that the sale may give shareholders the right to dissent to the Transaction. *Id.*, ¶ 45.

### F. Stankiewicz Surreptitiously Takes Steps to Attempt to Cause DMG to Extend Her Resignation Date So That She Can Benefit from the Transaction.

Stankiewicz reviewed the materials regarding the Transaction DMG provided on or around July 20, 2017. SOF ¶ 42. She realized that she would need to remain a DMG employee and shareholder in order to receive a personal financial benefit from the Transaction. *Id*. On July 23, 2017, Stankiewicz had a conversation with her colleague, Jeff Hsu, about dissenting to the Transaction.[3] SOF ¶ 43. They discussed Stankiewicz's need to extend her resignation date past the closing date to dissent to the Transaction. *Id.* Stankiewicz told Hsu that she would attempt to extend her employment. SOF ¶ 44. Hsu offered to put her in touch with attorneys. *Id.*

---

[3] Hsu testified that he and Stankiewicz are "loyal" friends. Ex. 1-G, pp. 78:23-79:5.

Stankiewicz never asked Dr. Merrick, Kasper, or anyone on the Board for permission to extend her resignation date. SOF ¶ 45. Instead, on July 24, 2017, Stankiewicz informed Ruggio and Bhatia that she would extend her resignation date one month, and work part time, even though she knew that neither possessed the authority to extend her resignation date. SOF ¶ 47.

Based on Stankiewicz's representation, Ruggio allegedly contacted certain MPAS employees regarding the administrative steps that were necessary to allow Stankiewicz to continue to practice medicine at DMG legally. D.E. 1, ¶¶ 59-61. Ruggio allegedly contacted Sharon McGuire and Claudia Sagredo in the credentialing department. *Id.,* ¶¶ 59-60. Sagredo served as the manager of credentialing. SOF ¶ 51. McGuire was a credentialing specialist. SOF ¶ 52. Their duties were to coordinate the credentialing process, which included monitoring licensing and malpractice coverage for DMG's medical staff. SOF ¶¶ 51-52. They did not have the authority to hire, fire, or otherwise affect a physician's employment. *Id.* They mistakenly assumed that Stankiewicz had obtained permission from DMG to extend her employment. *See* Ex. 1-V, at p. 39:6-18; Ex. 3, ¶ 10. Stankiewicz also alleges she sent Merrick and Kasper a letter on July 27 purporting to dissent to the Transaction. D.E. 1, ¶¶ 66-68.

### G. DMG's C-Suite Discovers Stankiewicz's Plan.

Ruggio also allegedly contacted Tunisia Hopkins regarding Stankiewicz's purported attempt to extend her resignation date. D.E. 1, ¶ 59.[4] Hopkins sent Ruggio's email to another human resources manager who forwarded it to Deborah Tate, DMG's V.P. of Human Resources. SOF ¶ 53. On July 25, 2017, Tate informed Fine, the COO, that Stankiewicz was seeking to extend her resignation date. SOF ¶ 56. Fine responded that he did not believe an extension was

---

[4] Hopkins was a human resources manager. She did not have responsibility for physician H.R. issues. SOF ¶ 53.

7

"doable as she resigned as of 7/31 and we accepted her resignation." *Id.* He forwarded the information to DMG's CEO, Kasper. *Id.*

### H. DMG's CEO Informs Stankiewicz that She Cannot Extend Her Resignation Date and Her Resignation Takes Effect on July 31, 2017.

Kasper consulted immediately with Dr. Merrick regarding Stankiewicz's attempt to extend her resignation date. SOF ¶ 57. They decided that DMG would not agree to allow Stankiewicz to extend her resignation date. SOF ¶¶ 57-58. Kasper then sent an email to Stankiewicz stating:

> You voluntarily submitted notice of resignation on April 30, 2017, informing us that you would continue with DMG until the end of July 2017 and that your family was moving out of state thereafter. We accepted your resignation and we have taken steps necessary to prepare for your departure. Respectfully, we decline your offer to extend your employment with DMG until August 31. Your separation date will remain July 31. We will continue to process your separation from DMG in the ordinary course.

SOF ¶ 58. Stankiewicz's employment with DMG ended on July 31, 2017. SOF ¶¶ 62-63.

There is no evidence that Stankiewicz, at that time, ever claimed to Kasper, Merrick, or anyone else at DMG that DMG had terminated her involuntarily. Indeed, during her deposition, Stankiewicz confirmed that DMG never terminated her. *See* SOF ¶ 63. In fact, Stankiewicz always expected that DMG's Board and C-Suite would not agree to the extension of her resignation date. For example, Stankiewicz had the following exchange with Hsu:

> Stankiewicz: Just heard from the "c-suite" that I'm not allowed to change my end date. *Hahaha. As expected.*
> Hsu: Did Patrick and you talk about this possibility?[5]
>
> Stankiewicz: Yes – he said I didn't need to stay past July 31 . . . And he said the timing would be this exactly. *When they would catch on.*

SOF ¶ 60 (emphasis added). Similarly, in a July 28, 2017 email, Stankiewicz stated:

---

[5] "Patrick" refers to Stankiewicz's attorney at that time, Patrick Fitzsimmons. *See* Ex. 1-A, p. 187:3-8.

> I bet they would have done this either way. *It just took them a few days to find out from HR.* So glad I did what I did.

SOF ¶ 61 (emphasis added). During her deposition, Stankiewicz confirmed that she had

attempted to stay at DMG to dissent and enjoy "the benefits of [the] sale." SOF ¶ 49.

### I.  DMG Tenders Stankiewicz Payment for the Fair Value of Her Shares Pursuant to the Terms of the Shareholder Agreement.

After Stankiewicz's employment with DMG ended, DMG, pursuant to Section 2 of the

Shareholder Agreement, tendered $11,000 to Stankiewicz on July 31, 2017 for the redemption of

her shares in DMG. SOF ¶¶ 64-65. The Transaction then closed on August 15, 2017. SOF ¶ 66.

### J.  Stankiewicz's Complaint.

Stankiewicz filed the instant action on May 31, 2018 seeking a declaratory judgment that

she is entitled to dissent to the Transaction. D.E. 1. Stankiewicz alleges that she would have

remained a shareholder at DMG when the Transaction closed but for the fact that DMG

terminated her involuntarily on July 31, 2017. *Id.,* ¶¶ 78-79. Specifically, Stankiewicz alleges

that "on July 24, 2017, DMG, by and through Ruggio, McGuire and/or Claudia Sagredo,

reinstated Dr. Stankiewicz's employment through August 31, 2017" but then DMG

"involuntarily terminated Dr. Stankiewicz's employment on July 31, 2017, without prior notice

or cause." *Id.*, ¶¶ 60, 78. The record demonstrates that these allegations have no merit.

### LEGAL STANDARD

Summary judgment should be granted if there is no genuine issue of material fact and the

movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. For there to be a

"genuine" issue of material fact, there must be more than "some metaphysical doubt as to the

material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986). "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

9

477 U.S. 242, 248 (1986)).  "[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000) (internal citations omitted).  If the responding party fails to properly address the moving party's assertion of fact, this Court "may grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

## ARGUMENT

The Declaratory Judgment Act authorizes federal courts to issue declaratory judgments where there is an actual controversy that is definite and concrete, involving legal relations of parties having adverse legal interests.  *See* 28 U.S.C. § 2201; *Trippe Mfg, Co. v. Am. Power Conversion Corp.,* 46 F.3d 624, 627 (7th Cir. 1995); *Cohn v. Guaranteed Rate Inc.,* 130 F. Supp. 3d 1198, 1205 (N.D. Ill. 2015).  Stankiewicz's Complaint seeks a declaration that DMG is required to pay Stankiewicz the "fair value" of Stankiewicz's shares in DMG, pursuant to the dissenter's rights provisions in the IBCA, because Stankiewicz allegedly dissented to the Transaction.  However, the record in this case establishes that Stankiewicz did not possess a right to dissent to the Transaction because she was not a shareholder when the Transaction closed.

**I.** **The IBCA Requires an Individual to Remain a Shareholder of a Corporation Through the Consummation Date of the Transaction to Perfect a Right to Dissent.**

Section 11.65 of the IBCA provides a shareholder of a corporation with the right "to dissent from, and obtain payment for his or her shares in the event of the . . . consummation of a sale, lease or exchange of all, or substantially, all of the property and assets of the corporation . . . ."  805 ILCS 5/11.65(a)(2).  This Court held that this right does not vest until the consummation or completion of a sale, lease, or exchange of corporate property.  *See* D.E. 48, pp. 8-10; *see also*

10

*Brynwood Co. v. Schweisberger,* 393 Ill. App. 3d 339, 361 (2d Dist. 2009). As a result, Section

11.65 of the IBCA only potentially conveys a statutory right to dissent to individuals who are

shareholders in the corporation on the date the sale, lease, or exchange of corporate property is

consummated. No statutory dissenter's right exists for individuals who do not own shares in the

corporation on this date. *See* D.E. 48, p. 9 ("if a shareholder no longer has an ownership right to

shares at the time the transaction is consummated, the shareholder cannot receive a fair value for

such shares under the dissenter appraisal process provided by 805 Ill. Comp. Stat. 5/11.70").

**II.  Stankiewicz Did Not Have the Right to Dissent to the Transaction Because She Was
Not a Shareholder When the Transaction Closed.**

The Transaction closed on August 15, 2017. SOF ¶ 66. Therefore, Stankiewicz needed

to be a shareholder on August 15, 2017 in order to dissent to the Transaction. *See* D.E. 48, p. 9.

She was not. Rather, the record in this case establishes that Stankiewicz divested any interest she

held in DMG by no later than July 31, 2017.

**A.  Stankiewicz's Voluntary Resignation of Employment on July 31, 2017
Resulted in the Redemption of Her Shares.**

The Shareholder Agreement operated to redeem Stankiewicz's shares in DMG

automatically when her employment ended because it provides that Stankiewicz's:

> Shares shall be *automatically redeemed* and shall no longer be deemed
> outstanding for any reason upon the occurrence of any one of the following
> events: . . . *The termination of employment of the Shareholder with the Clinic for
> any reason.*

SOF ¶ 20 (emphasis added).

The record here establishes that Stankiewicz voluntarily tendered notice of her

resignation on May 1, 2017, with an effective date of July 31, 2017. SOF ¶ 31. DMG accepted

the resignation. SOF ¶ 33. Between May 1, 2017 and July 31, 2017, DMG took steps to prepare

for Stankiewicz's departure, including hiring new physicians, sending a letter to patients

11

regarding Stankiewicz's resignation, informing hospitals, blocking her schedule, cancelling her malpractice, and moving patients off her schedule. SOF ¶¶ 35-40. Then, Stankiewicz's employment with DMG ended on July 31, 2017, pursuant to her voluntary resignation, because DMG never agreed to extend her resignation date. SOF ¶¶ 57-58, 62-63. Thus, DMG redeemed any shares that Stankiewicz held in DMG on July 31 by operation of Section 3.1(c) of the Shareholder Agreement. SOF ¶¶ 64-65. Since Stankiewicz's shares in DMG were redeemed by no later than July 31, 2017, Stankiewicz did not own any shares in DMG when the Transaction was "consummated" on August 15, 2017.

**B.    DMG Never Agreed to Extend Stankiewicz's Resignation Date.**

Stankiewicz complains that the Court should not give effect to the redemption provision in Section 3.1(c) because Stankiewicz had allegedly entered into an agreement with DMG to extend her employment to August 31, 2017 and then DMG terminated Stankiewicz involuntarily on July 31, 2017. *See* D.E. 1, ¶¶ 56-63, 77-79. However, the record establishes that this allegation has no merit. DMG never entered into a valid enforceable agreement with Stankiewicz to extend her employment to August 31, 2017.

**1.    The Record Establishes That No Agreement Between DMG and Stankiewicz To Extend Her Resignation Date Ever Existed.**

Under Illinois law, a resignation may be either written or oral and is effective immediately without the necessity of an acceptance. *See Eurich v. Korean Foundation, Inc.,* 31 Ill. App. 2d 474, 485-86 (1st Dist. 1961); *Tate v. Wabash Datatech, Inc.,* 147 Ill. App. 3d 230, 234 (2d Dist. 1986); *cf Brammer-Hoelter v. Twin Peaks Charter Acad.,* 492 F.3d 1192, 1211 (10th Cir. 2007) (holding that employment agreements that provide unilateral right to terminate employment do not require acceptance for the resignation to be effective). An employer does not possess any obligation to allow an employee to rescind or modify her resignation once she had

12

voluntarily tendered her notice. *See Wilkerson v. Springfield Public School Dist., No. 186*, 40 Fed. Appx. 260, 263 (7th Cir. 2002); *Gras v. Clark,* 46 Ill. App. 3d 803, 808 (2d Dist. 1977); *see also Cadet v. Deutsche Bank* Secs., *Inc.*, 11-cv-07964, 2013 WL 3090690, at *13 (S.D.N.Y. June 18, 2013) ("employers are not usually obligated to allow their employees to rescind their resignations"); *MacLean v. City of St. Petersburg,* 194 F. Supp. 2d 1290, 1303 (M.D. Fla. Mar. 18, 2002) (same); *Smith v. DeTar Hosp.,* No. V-10-83, 2012 WL 2871673, *13 (S.D. Tex. July 11, 2012) (same).

Instead, an employee would need to enter into a subsequent valid agreement with her employer to extend her employment. To enter into a valid contractual agreement under Illinois law there must be an offer, acceptance, and consideration. *See Gupta v. Morgan Stanley,* No. 18-3584, 2019 WL 3886452, at *5 (7th Cir. 2019); *Melena v. Anheuser-Busch, Inc.,* 219 Ill. 2d 135, 151-52 (Ill. 2006). In this case, Stankiewicz voluntarily tendered her notice of resignation to DMG on May 1, 2017, with an effective date of July 31, 2017. SOF ¶¶ 31-32. Then, on or around July 24, 2017, Stankiewicz sought to have DMG extend her resignation date until August 31, 2017. However, DMG never accepted any offer by Stankiewicz to extend her resignation date. SOF ¶¶ 57-58. Rather, DMG refused to agree to allow Stankiewicz to extend her resignation date after she resigned voluntarily. *Id.*

Specifically, DMG's CEO contacted Stankiewicz shortly after he learned that Stankiewicz sought to extend her employment. In response to her offer, he stated:

> We accepted your resignation and we have taken steps necessary to prepare for your departure. Respectfully, we decline your offer to extend your employment with DMG until August 31. Your separation date will remain July 31.

SOF ¶ 59. DMG's Rule 30(b)(6) representative and DMG's President also confirmed that DMG denied Stankiewicz's request to extend her resignation date. *See* SOF ¶¶ 58-59. Indeed,

Stankiewicz herself confirmed that DMG declined her offer to extend her resignation date. *See* SOF ¶¶ 58, 63.

Stankiewicz also conceded that DMG did not terminate her employment involuntarily on July 31, 2017. Specifically, she testified as follows:

Q. And you decided to resign from DMG?

A. Yes.

Q. And you decided to leave from DMG?

A. Yes.

*Q. Okay. And DMG did not fire you, correct?*

*A. Correct.*

SOF ¶ 63, Ex. 1-A, p. 250:10-18 (emphasis added). Stankiewicz's colleagues also confirmed that DMG did not terminate Stankiewicz but that Stankiewicz resigned voluntarily on July 31, 2017. *See id,* Ex. 1-F, p. 110:22-23; Ex. 1-H, p. 218:4-16. Therefore, the record demonstrates conclusively that DMG never accepted Stankiewicz's offer to extend her resignation date and did not terminate Stankiewicz involuntarily on July 31, 2017.

**2.    The Record Establishes That No One With Authority to Bind DMG Ever Agreed to Extend Stankiewicz's Resignation Date.**

Even if the Court were to disregard Stankiewicz's unequivocal admissions, there is still no evidence that anyone with authority to bind DMG ever entered into an agreement with Stankiewicz to extend her resignation date to August 31, 2017. Under Illinois law, "[a] contract executed by a party that does not have authority is void *ab initio*." *Siena at Old Orchard Condo. Ass'n v. Siena at Old Orchard, L.L.C.,* 2017 IL App (1st) 151846, ¶ 77 (1st Dist. 2017). A corporation is a legal entity separate from its directors, officers, and shareholders, but it can only act through its officers and directors and is bound by their actions when performed within the

14

scope of their authority.  *See Wells Fargo Bus. Credit v. Hindman,* 734 F.3d 657, 667 (7th Cir.

2013).  The "business and affairs of the corporation shall be managed by or under the direction

of the board of directors."  805 ILCS 5/8.05(a); *see also id.*  As a result, the board "is the true

agent of a corporation."  *Wells Fargo,* 734 F.3d at 667.  For another employee to bind a

corporation, the employee must have received an express grant of authority from the board or an

implied grant through the board having placed the individual in a corporate office or position

which carries the inherent authority to act for the corporation in certain transactions.  *See Chase*

*v. Consolidated Foods Corp.,* 744 F.2d 566, 568-69 (7th Cir. 1984).  Without actual or apparent

authority to act on the employer's behalf, an employee cannot bind her employer to a contract.

*See, e.g., id.; Wells Fargo,* 734 F.3d at 667; *Marcus & Millchap Real Estate Inv. Services Inc. v.*

*Sekulovski*, No. 07 C 5369, 2009 WL 1543710, at *5 (N.D. Ill. June 2, 2009); *Malcak v.*

*Westchester Park Dist.,* 754 F.2d 239, 244-45 (7th Cir. 1985); *see also Wisconsin Elec.*

*Employees Health & Welfare Plan v. KMS Elec., LLC*, No. 14–CV–521, 2015 WL 4487072, at

*4-5 (E.D. Wis. Jul. 23, 2015).

The record in this case establishes that only DMG's Board and CEO possessed the

authority to act on behalf of DMG to agree to extend Stankiewicz's resignation date.  *See* SOF ¶¶

8, 12.  Stankiewicz never entered into an agreement with DMG's Board, President, or CEO to

extend her resignation date.  *See* SOF ¶¶ 45-46.  Indeed, Stankiewicz conceded during her

deposition that she never sought permission from DMG's Board, President, CEO, or any other

member of the C-Suite to extend her resignation date.  SOF ¶ 45-46.

Instead, Stankiewicz's Complaint alleges that "on July 24, 2017, DMG through Ruggio,

McGuire and/or Claudia Sagredo, reinstated Dr. Stankiewicz's employment through August 31,

2017."  D.E. 1, ¶ 60.  During her deposition, Stankiewicz refined this allegation by claiming that

15

she entered into oral agreement with DMG "through Sue Ruggio" to extend her resignation date. Ex. 1-A, at p. 143:9-21.  Even assuming Ruggio (or Sagredo or McGuire) entered into such an agreement with Stankiewicz, the undisputed facts demonstrate that those employees did not possess the authority to enter into an enforceable agreement of employment on behalf of DMG.[6]

   *a. Ruggio, Sagredo, and McGuire Did Not Have Express Authority.*

  Express authority is actual authority granted explicitly by the principal to the agent.  *See Cove Mgt. v. Aflac, Inc.,* 2013 Ill. App. (1st) 120884, ¶ 23 (1st Dist. 2013).   As set forth above, express authority rests with DMG's Board as a matter of law unless the Board delegated that authority.  *See Chase,* 744 F.2d at 568-69; *Wells Fargo,* 734 F.3d at 667.  DMG never explicitly gave Ruggio, Sagredo, or McGuire the authority to make employment decisions with respect to DMG's physicians.  The Board never delegated the authority to make any employment decisions with respect to physicians to anyone besides the CEO. SOF ¶¶ 8, 11-12.  Indeed, Ruggio, Sagredo, and McGuire each testified that DMG never authorized them to make employment decisions with respect to DMG's physicians.  SOF ¶¶ 27, 51-52.  And, Dr. Stankiewicz, herself, testified that she knew that Ms. Ruggio did not possess the authority to extend her employment. SOF ¶ 28.  Therefore, the record is clear that neither Ruggio, McGuire, nor Sagredo possessed express authority to extend Stankiewicz's resignation date.

   *b. Ruggio, Sagredo, and McGuire Did Not Have Implied Authority.*

  Implied authority is actual authority inherent in an agent's position.  *See Cove,* 2013 Ill. App. (1st) 120884, ¶ 23; *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.,* 326 Ill. App. 3d 126, 136 (2d Dist. 2001); *Orix Credit Alliance v. Taylor Mach. Works,* 125 F.3d 468, 474 (7th Cir. 1997).  It is merely actual authority proved by circumstantial evidence.  *See Cove,* 2013 Ill. App.

---

[6] During her deposition, Ruggio testified that she had never entered into an agreement with Stankiewicz. Ex. 1-H, p. 74:12-14.

(1st) 120884, at ¶ 23; *Amcore,* 326 Ill. App. 3d at 136. The record establishes that Ruggio, McGuire, and Sagredo did not have implied authority to act on behalf of DMG to agree to extend Stankiewicz's resignation date.

First, there is no circumstantial evidence that DMG had ever granted Ruggio, McGuire, or Sagredo authority to make employment decisions with respect to DMG's physicians. To the contrary, every witness has testified that DMG never granted such authority Ruggio, McGuire, or Sagredo, including Ruggio, McGuire, and Sagredo themselves. *See* SOF ¶¶ 8, 12, 27, 51-52.

Second, the ability to make employment decisions with respect to DMG's physicians is not inherent in the positions of a credentialing manager, credentialing specialist, or practice manager. *See, e.g., Orix,* 125 F.3d at 475 (holding that there is "nothing inherent in the title of director of marketing that gives" the employee the power to bind the corporation). Sagredo, McGuire, and Ruggio were not members of DMG's Board or C-Suite. *See* SOF ¶¶ 27, 51-52. Not one of them even reported directly to the C-Suite. *Id.* There is also no evidence that any physician employees reported to Sagredo, McGuire, or Ruggio. Rather, Ruggio testified that she reported to the physicians. SOF ¶ 27. Therefore, the positions Ruggio, Sagredo, and McGuire held did not have the inherent authority to make decisions on behalf of DMG with respect to physician employment issues.

    c.  *Ruggio, McGuire, and Sagredo Did Not Have Apparent Authority.*

Apparent authority is defined as such authority as the principal knowingly permits the agent to assume or which he holds his agent out as possessing – it is such authority as a reasonably prudent man, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. *See Cove,* 2013 IL App (1st) 120884, at ¶ 24. For an agent to possess apparent authority, the appearance of authority must be based on the words

17

and acts of the principal and cannot be based on anything the agent himself has said or done. *See Cove,* 2013 IL App (1st) 120884, at ¶ 24. Apparent authority will also only exist if a plaintiff establishes that he or she relied on the agent's authority to his or her detriment. *See id.*; *see also Gambino v. Blvd. Mortg. Corp.,* 398 Ill. App. 3d 21, 56 (1st Dist. 2009) ("[t]o prove the existence of apparent authority, a party must establish that . . . the third party relied to his detriment on the agent's apparent authority"); *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.,* No. 15 C 1785, 2018 WL 2072858, *8 (N.D. Ill. May 3, 2018) (same).

Moreover, a plaintiff cannot establish apparent authority if the plaintiff acts negligently with respect to the extent of the agent's authority. Rather, "he must use reasonable diligence and prudence to ascertain whether the agent is acting and dealing with him within the scope of his powers." *Cove,* 2013 IL App (1st) 120884, at ¶ 27, *quoting* 3 Am. Jr. 2d Agency § 78 (1962). A plaintiff cannot establish the existence of apparent authority if the plaintiff "knows, or has good reason for believing, that the acts exceed the agent's powers or if such reasonable inquiry as he is under the duty to make, would result in discovery of the true state of the powers and he fails to fulfill that duty." *Id.*; *Chase,* 744 F.2d at 569 (same); *Landmark,* 2018 WL 2072858 (same). The record in the instant case demonstrates conclusively that Ruggio, McGuire, or Sagredo did not possess apparent authority to extend Stankiewicz's employment.

        (i)     *Stankiewicz Possessed Actual Knowledge of the Fact that Ruggio, Sagredo, and McGuire Did Not Have the Authority to Extend Her Resignation Date.*

Stankiewicz cannot establish that Ruggio, Sagredo, or McGuire possessed apparent authority to extend her resignation date because she had actual knowledge that they did not possess such authority. *See Cove*, 2013 IL App (1st) 120884, at ¶ 27; *see also Chase,* 744 F.2d at 569 ("An appearance of authority that fools no one does not bind the principal"). First,

18

Stankiewicz conceded during her deposition that she knew that Ruggio did not possess such authority. When asked if "anyone from DMG ever told you that Ms. Ruggio had the authority to extend your employment," Stankiewicz responded that:

> *No, I wasn't under the impression that Sue could extend my employment*.

SOF ¶ 28, Ex. 1-A, p. 161:2-6 (emphasis added).

Second, Stankiewicz knew that these individuals did not have authority because she agreed in the Employment Agreement to contact DMG's President and CEO regarding any proposed modifications to the terms and conditions of her employment. SOF ¶ 14. Indeed, Stankiewicz admitted that she understood the Employment Agreement governed the terms and conditions of her employment, including any issues involving resignation or termination.[7] *Id*. And, she conceded that the provision in the Employment Agreement that "[a]ll notices or communications to the medical group shall be delivered or mailed to the attention its president and its chief executive" required her to seek permission from Dr. Merrick or Mr. Kasper in order to have her employment extended. SOF ¶ 17.

Third, Stankiewicz's contemporaneous communications with Hsu and her husband confirm that Stankiewicz knew that she could not obtain permission from Ruggio, McGuire, or Sagredo to extend her resignation date because she knew she needed to obtain permission from DMG's Board and C-Suite. Specifically, Stankiewicz told Hsu that she always "expected" that the C-Suite would not agree to extend her resignation date. *See* SOF ¶ 60 ("Just heard from the 'c-suite' that I'm not allowed to change my end date. *Hahaha. As expected*."). Her actual knowledge is further confirmed by the fact that she sought to conceal her plan to attempt to extend her employment from the Board and the C-Suite. *See id.* ("Hsu: Did Patrick and you talk

---

[7] DMG's Physician Handbook also directed physicians to their Employment Agreements for any issues involving resignation or termination. *See* SOF ¶ 14.

about this possibility? Stankiewicz: Yes – he said I didn't need to stay past July 31 . . . And he said the timing would be this exactly. *When they would catch on."*); SOF ¶ 61 ("I bet they would have done this either way. *It just took them a few days to find out from H.R.*"). These admissions are fatal to Stankiewicz's claim because she cannot establish apparent authority when she knew that Ruggio, McGuire, and Sagredo did not possess the authority to extend her resignation date. *See Cove,* 2013 IL App (1st) 120884, at ¶ 27; *Siena,* 2017 IL App (1st) 151846, at ¶ 80; *Chase,* 744 F.2d at 569.

> (ii)    *DMG Never Held Out Ruggio, McGuire, or Sagredo as Possessing Authority.*

There is also no evidence in the record that suggests that DMG ever held out Ruggio, McGuire, or Sagredo as possessing the authority to act on behalf of DMG to make personnel decisions with respect to the employment of physicians. Rather, the witnesses testified consistently that everyone at DMG understood that a physician would need permission from DMG's Board or C-Suite to have a resignation date extended. SOF ¶ 12.

> (iii)    *Stankiewicz Failed To Make Any Inquiry Into the Status of the Authority Ruggio, Sagredo, or McGuire Possessed.*

Stankiewicz also made no efforts to determine the scope of either Ruggio or anyone else's authority with respect to an agreement regarding the extension of her employment. As set forth above, Stankiewicz's testimony, contemporaneous communications, and Employment Agreement demonstrate that she had good reason to know that Ruggio, McGuire, and Sagredo did not have the authority to extend her resignation date. In addition, Ruggio had also informed Stankiewicz that Stankiewicz needed to contact either Kasper, Merrick, or Fine regarding Stankiewicz's resignation from DMG. SOF ¶ 30. Indeed, Stankiewicz knew that she needed to contact DMG's "senior management" to provide them with notice of her resignation. SOF ¶ 29.

However, despite possessing sufficient information to have notice that Ruggio, McGuire, and Sagredo did not possess the authority to extend her resignation date, Stankiewicz did not make any inquiry to determine whether they possessed the authority to extend her resignation date. Specifically, Stankiewicz never communicated with anyone from the Board, the C-Suite, or anyone else in DMG's corporate department regarding whether or not they could extend her employment. SOF ¶¶ 45-46. She never asked anyone to tell her what process she should follow in seeking to have her employment extended. SOF ¶ 48. She never asked Ruggio who Ruggio had contacted on her purported behalf. SOF ¶ 54. She never inquired whether Ruggio, Sagredo, or McGuire possessed the authority to extend her employment. SOF ¶ 55.

Therefore, Stankiewicz cannot establish that Ruggio, McGuire, or Sagredo possessed apparent authority to extend her resignation date because she did not make any efforts or inquiry to determine the scope of their respective authority. *See Cove,* 2013 IL App (1st) 120884, at ¶ 28 (holding that plaintiff could not establish apparent authority because "[t]he record in the instant case does not show that plaintiff made any effort to determine whether Galgano was an independent contractor or an agent of AFLAC acting within the scope of his authority"); *Landmark,* 2018 WL 2072858, at *8 (same).

(iv)    *Stankiewicz Cannot Establish Detrimental Reliance*

Finally, Stankiewicz cannot establish the existence of apparent authority because there is no evidence that Stankiewicz relied on any third party's representations to her detriment. *See Classic Fire & Marine Ins. Co. v. Illinois Ins. Exch.,* No. 97 C 1256, 1997 WL 767290, at *6 (N.D. Ill. Dec. 3, 1997) (finding no apparent authority where there was no detrimental reliance); *Landmark,* 2018 WL 2072858, at *8 (same). For example, there is no evidence that Stankiewicz

21

declined a job offer because she believed that she would stay with DMG for one additional month. Since Stankiewicz did not suffer a detriment, she cannot establish apparent authority.

### 3. The Statute of Frauds Bars Any Oral Agreement With Respect to the Extension of Stankiewicz's Resignation Date.

Even if Stankiewicz had reached an agreement with DMG to extend her resignation date, the agreement would still not be valid and enforceable because the Illinois statute of frauds bars the enforcement of any oral agreement entered into between Stankiewicz and DMG. The Illinois statute of frauds precludes enforcement of oral contracts that cannot be performed within a year of their making. *See* 740 ILCS 80/1; *McInerney v. Charter Golf, Inc.,* No. 01 C 7674, 176 Ill. 2d 482, 489 (1997); *Do It Best Corp. v. Passport Software, Inc.,* No. 01 C 7674, 2005 WL 743083, at *10 (N.D. Ill. Mar. 31, 2005). If there is an oral modification to an existing written contract, the modification cannot be read in isolation for purposes of the statute of frauds. Rather, the court must consider the terms of the original written agreement, as modified. This means that when a contract affected by the statute of frauds has been put in writing, and afterwards orally modified, the modified agreement is also within the statute. *See Do It Best,* 2005 WL 743083, at *10; *Dickens v. Quincy College Corp.,* 245 Ill.App.3d 1055, 1059 (4th Dist. 1993)**;** *see also Zusy v. Int'l Med. Group, Inc.,* 500 F. Supp. 2d 1087, 1096 (S.D. Ind. 2007) (J. Hamilton).

In this case, the Illinois statute of frauds bars Stankiewicz's claim because she alleges that she and DMG agreed to an oral modification of the terms of her written Employment Agreement. Stankiewicz conceded that she never entered into a written agreement with DMG to extend her resignation date. SOF ¶ 50. Instead, she contends that she entered into an oral agreement with DMG to allow her to extend her resignation date whereby she would only be required to work three days per week. *See* Ex. 1-A, at pp. 143:9-14; Ex. 1-H, at pp. 83:23-84:11. In other words, Stankiewicz claims that she and DMG agreed to orally modify the provision in

the Employment Agreement that gave DMG control over setting Stankiewicz's employment schedule (SOF ¶ 18) because she and Ruggio allegedly reached an agreement that would limit her schedule to three days a week.

The statute of frauds bars enforcement of such a contract in the absence of a signed writing because the Employment Agreement falls within the statute of frauds as it is an agreement with a term of employment of one year. Specifically, it provides a term of employment for Stankiewicz of "successive 12 month periods unless terminated by either party in accordance with its terms." SOF ¶¶ 13-14. Thus, the alleged agreement between Stankiewicz and DMG to extend her resignation date is unenforceable and Stankiewicz's claim fails.

### C. DMG Possessed the Ability to Redeem Stankiewicz's Shares At Any Time After Stankiewicz Tendered Her Notice of Resignation.

DMG also possessed the ability to redeem Stankiewicz's shares on July 31, 2017 for the amount set forth in the Shareholder Agreement, regardless of whether or not DMG agreed to extend Stankiewicz's employment, because there is no dispute that Stankiewicz had decided on May 1, 2017 to terminate her interest in DMG as a shareholder. Section 2(d) of the Shareholder Agreement provides that Stankiewicz's:

> Shares shall be automatically redeemed by the Clinic and shall no longer be deemed outstanding for any reason upon the occurrence of any one of the following events . . . (d) The decision of the Shareholder to terminate [her] interest in the Clinic as a Shareholder . . . .

SOF ¶ 20. By voluntarily tendering her notice to resign on May 1, 2017, Stankiewicz made a decision to terminate her interest in DMG as a shareholder because only employees of DMG can be shareholders in DMG. *See* SOF ¶¶ 20, 34. Indeed, Stankiewicz understood that by resigning from DMG, she would cease to be a shareholder in DMG. *See* SOF ¶ 34. Therefore, DMG possessed the ability to redeem Stankiewicz's shares on July 31, 2017 under the terms of the Shareholder Agreement, regardless of the status of her employment, because there is no dispute

that Stankiewicz had made a decision to terminate her interest in DMG as a shareholder when she tendered her notice of resignation. Since DMG redeemed the shares on July 31, Stankiewicz was not entitled to dissent to the Transaction and her claim fails as a matter of law.

### III. The Doctrine of Unclean Hands Bars Stankiewicz's Claim.

Stankiewicz claims that she is entitled to declaratory relief because she allegedly reached an agreement with DMG, through Ruggio, to extend her employment even though she attempted to conceal her attempts to extend her resignation date from DMG's Board and C-Suite. The equitable doctrine of unclean hands should bar Stankiewicz's claim.

This doctrine provides that a party seeking equitable relief cannot take advantage of his own wrong. *See State Bank of Geneva v. Sorenson,* 167 Ill. App. 3d 674, 680 (2d Dist. 1988); *Mittelstaedt v. Gamla-Cedron Orleans, LLC,* No. 12 C 5131, 2012 WL 6188548, at *3 (N.D. Ill. Dec. 12, 2012). It is designed to prevent a "wrongdoer from enjoying the fruits of [her] transgression." *Packers Trading Co v. CFTC,* 972 F.2d 144, 149 (7th Cir. 1992). Equitable relief may be denied if the party seeking that relief is guilty of misconduct, fraud, or bad faith toward the party against whom relief is sought, and further provided that the misconduct, fraud, or bad faith is in connection with the transaction under consideration. *See State Bank,* 167 Ill. App. 3d at 680.[8]

Stankiewicz acted in bad faith towards DMG. She voluntarily resigned from DMG and provided DMG with an effective date for her resignation. SOF ¶ 31. She knew that DMG had taken actions in response to her resignation, including hiring new dermatologists, informing patients, and modifying patient schedules. SOF ¶¶ 35-40. However then, after learning about the Transaction and its potential payouts, Stankiewicz initiated a plan to cause DMG to extend

---

[8] A claim for a declaratory judgment is a claim for equitable relief. *See America's Money Line, Inc. v. Coleman,* 360 F.3d 782, 786 (7th Cir. 2004) (describing a declaratory judgment as an "equitable remedy").

her employment, without the knowledge or permission of DMG's Board or C-Suite, for the purpose of reaping a substantial pecuniary gain from the Transaction that she would not otherwise have been entitled to as a result of her voluntary resignation. SOF ¶¶ 42-49. Stankiewicz's intent to conceal her efforts from DMG's Board and C-Suite is revealed by the following communication she had with Hsu: "Hsu: Did Patrick and you talk about this possibility? Stankiewicz: Yes . . . he said the timing would be this exactly. *When they would catch* on." SOF ¶ 60. These acts of bad faith were also undertaken in connection with the transaction under consideration. Stankiewicz testified explicitly that she attempted to extend her employment to "enjoy . . . the benefits of" the Transaction that she now asserts a right to dissent to. SOF ¶ 49. Therefore, the doctrine of unclean hands should also bar Stankiewicz's claim.

The Seventh Circuit's decision in *Packer Trading* is instructive here. In that case, a party had intentionally and surreptitiously attempted to profit from a mistake a trading firm made with timing of his contract orders and cancellations. *See Packer,* 972 F.2d at 147. The Seventh Circuit held that the doctrine of unclean hands barred the party's claims because the doctrine is designed to prevent the wrongdoer from enjoying the fruits of his transgressions. *See id.,* at 149. Similarly here, Stankiewicz seeks to profit from the mistakes that certain administrative personnel made in extending Stankiewicz's credentialing privileges and malpractice insurance when she had intentionally and surreptitiously concealed her attempt to extend her employment from DMG's decision-makers. She should not enjoy any fruits from her transgressions. The Court should bar her claim for this additional reason.

## CONCLUSION

Wherefore, the Court should grant DMG's motion for summary judgment, enter judgment in DMG's favor, and grant DMG any other relief the Court deems just.

Dated:  September 18, 2019        Respectfully submitted,

Du Page Medical Group, Ltd.


By: /s/ *Peter B. Allport*
      One of Its Attorneys

Steven S. Scholes (# 6191220)
Peter B. Allport (# 6295762)
Sean Koller (# 6324181)
MCDERMOTT WILL & EMERY LLP
444 W. Lake Street
Suite 4000
Chicago Illinois  60606
Tel: (312) 372-2000
Fax: (312) 984-7700
sscholes@mwe.com
pallport@mwe.com
skoller@mwe.com

## <u>CERTIFICATE OF SERVICE</u>

I, Peter B. Allport, hereby certify that on September 18, 2019, I electronically filed the foregoing document with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system, which will send a notice of electronic filing to the attorneys of record.

/s/  *Peter B. Allport*