**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KELLY STANKIEWICZ, MD, FAAD

        Plaintiff,

    v.

DU PAGE MEDICAL GROUP, LTD., d/b/a
DUPAGE MEDICAL GROUP, an Illinois
corporation,

        Defendant.

No. 1:18-cv-03823

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

William J. Serritella, Jr. (#6210001)
wserritella@taftlaw.com
Brianna M. Skelly (#6298677)
bskelly@taftlaw.com
Nicollette L. Khuans (#6320914)
nkhuans@taftlaw.com
Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile:  (312) 527-4011
*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

I.        INTRODUCTION ................................................................................................. 1

II.       FACTS THAT REQUIRE THE DENIAL OF SUMMARY JUDGMENT .............. 1

III.      ARGUMENT ...................................................................................................... 11

    A.    Standard of Review ..................................................................................... 11

    B.    Dr. Stankiewicz was a shareholder when the Transaction was consummated. ....... 11

        1.   Those with apparent authority to communicate DMG's employment decisions bound DMG to the agreement with Dr. Stankiewicz. ............................... 12

            a.   Hopkins and McGuire possessed apparent authority to communicate DMG's acceptance of the contract extension. ...................................................... 12

            b.   Dr. Bhatia and Ruggio possessed apparent authority to communicate DMG's acceptance of the contract extension. ...................................................... 13

            c.   Dr. Stankiewicz reasonably inquired into the scope of authority. ....................... 16

            d.   Dr. Stankiewicz did not breach the Notice Provision. ........................................... 17

        2.   Alternatively, DMG ratified the extension of employment. .................................... 18

    C.    DMG did not have the right to redeem Dr. Stankiewicz's shares. ......................... 20

    D.    The unclean hands doctrine does not bar Dr. Stankiewicz's claim. ........................ 22

    E.    The Statute of Frauds does not bar Dr. Stankiewicz's claim. .................................. 24

IV.     CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Cent. Ill. Light Co. v. Consolidation Coal Co.*,
    235 F. Supp. 2d 916 (C.D. Ill. 2002) ...................................................................................25

*Clark v. Walker*,
    04-C-941, 2004 WL 2967105 (N.D. Ill. Nov. 30, 2004) ......................................................24

*Cloud Corp. v. Hasbro, Inc.*,
    314 F.3d 289 (7th Cir. 2002) ...............................................................................................25

*Dunkin' Donuts, Inc. v. Towns Family, Inc.*,
    95-C-3666, 1995 WL 591454 (N.D. Ill. Oct. 4, 1995) .........................................................18

*Dunning v. Chem. Waste Mgmt., Inc.*,
    91-C-2502, 1997 WL 222891 (N.D. Ill. Apr. 22, 1997).......................................................18

*Evanston Bank v. Conticommodity Servs., Inc.*,
    623 F. Supp. 1014 (N.D. Ill. 1985) ......................................................................11, 14, 18, 19

*Gambino v. Boulevard Mortg. Corp.*,
    398 Ill. App. 3d 21, 922 N.E.2d 380 (1st Dist. 2009)...........................................................23

*Gondeck v. A Clear Title & Escrow Exch., LLC*,
    47 F. Supp. 3d 729 (N.D. Ill. 2014) .....................................................................................16

*Hepp v. Ultra Green Energy Servs., LLC*,
    13-C-4692, 2016 WL 1073070 (N.D. Ill. Mar. 18, 2016) .....................................................14

*Hofner v. Glenn Ingram & Co.*,
    140 Ill. App. 3d 874, 489 N.E.2d 311 (1st Dist. 1985)..........................................................12

*Jameson Real Estate, LLC v. Ahmed*,
    2018 IL App (1st) 171534, 129 N.E.3d 128 .........................................................................22

*Krieger v. Adler, Kaplan & Begy*,
    94-C-7809, 1997 WL 323827 (N.D. Ill. Jun. 11, 1997) .......................................................24

*Lombardo v. Reliance Elevator Co.*,
    315 Ill. App. 3d 111, 733 N.E.2d 874 (1st Dist. 2000).........................................................17

*Loncarevic & Assocs., Inc. v. Stanley Foam Corp.*,
    2017 IL App (1st) 150690, 72 N.E.3d 798 ..........................................................................15

*Lundberg v. Church Farm, Inc.*,
    151 Ill. App. 3d 452, 502 N.E.2d 806 (2d Dist. 1986) ....................................................12, 15

*Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*,
    383 Ill. App. 3d 645, 891 N.E.2d 1 (1st Dist. 2007)......................................................................17

*Mohawk Spring Div. of MW Indus., Inc. v. ZD Integrated Circuits, Inc.*,
    17-CV-9227, 2018 WL 6493327 (N.D. Ill. Dec. 10, 2018).......................................................12

*Profit Mgmt. Dev., Inc. v. Jacobson, Brandvik & Anderson, Ltd.*,
    309 Ill. App. 3d 289, 721 N.E.2d 826 (2d Dist. 1999) .............................................................22

*Puroon, Inc. v. Midwest Photographic Res. Ctr., Inc.*,
    16-C-7811, 2018 WL 5776334 (N.D. Ill. Nov. 2, 2018) ..........................................................19

*Robinson v. BDO Seidman, LLP*,
    367 Ill. App. 3d 366, 854 N.E.2d 767 (1st Dist. 2006)............................................................24

*SKF USA, Inc. v. Bierkness*,
    636 F. Supp. 2d 696 (N.D. Ill. 2009) .......................................................................................12

*SMK Assocs., LLC v. Sutherland Glob. Servs., Inc.*,
    14-C-284, 2016 WL 5476256 (N.D. Ill. Sept. 29, 2016)....................................................11, 19

*Spitz v. Proven Winners N. Am., LLC*,
    759 F.3d 724 (7th Cir. 2014) ...................................................................................................12

*Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*,
    424 F.3d 542 (7th Cir. 2005) ...................................................................................................25

*Vertex Refining, NV, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    374 F. Supp. 3d 754 (N.D. Ill. 2019) ..................................................................................11, 18

*Walker v. Ingersoll Cutting Tool Co.*,
    915 F.3d 1154 (7th Cir. 2019) .................................................................................................24

*Zahl v. Krupa*,
    365 Ill. App. 3d 653, 850 N.E.2d 304 (2d Dist. 2006) .............................................................22

*Zusy v. Int'l Med. Group, Inc.*,
    500 F. Supp. 2d 1087 (S.D. Ind. 2007) ...................................................................................24

## I.     INTRODUCTION

The primary issue presented by DMG's Motion for Summary Judgment is whether Dr. Stankiewicz could rely on the apparent authority of DMG's Dermatology Department Chair and Practice Manager who gave her written notice that DMG approved the extension of her employment to August 31, 2017, and where DMG also changed her departure date in its computer system, extended her malpractice insurance and access to patient records, notified hospitals and health plans of the new departure date, and put 261 patients on her August schedule.

A reasonable trier of fact could conclude that DMG's managers, clothed with apparent authority to speak and act on its behalf, bound DMG to the agreement to postpone Dr. Stankiewicz's departure for a month so that she could treat for a final time 261 waitlisted patients, some of whom were struggling with cancer. She detrimentally relied on DMG's agreement by changing 49 patient treatment plans. Only after learning that she lawfully dissented to the sale under Section 11.70 of the Illinois Business Corporation Act of 1983 (the "IBCA") did DMG breach the agreement to extend her employment in order to deny her the value of her shares. But for DMG's breach, Dr. Stankiewicz was a shareholder when the sale was consummated.

Finally, DMG's statement of facts warrants serious scrutiny because it mischaracterizes witness testimony and provides an incomplete and misleading timeline. DMG also misapplies the law on unclean hands and the Statute of Frauds. Thus, DMG is not entitled to judgment as a matter of law that it was not bound to the parties' agreement to extend Dr. Stankiewicz's employment.

## II.     FACTS THAT REQUIRE THE DENIAL OF SUMMARY JUDGMENT

In 2017, DMG had about 4,500 employees, including more than 700 physicians and 50 clinical departments in over 120 Chicagoland locations. (PSOF ¶ 1)[1] Several individuals and

---

[1] Citations to Plaintiff's Statement of Facts ("PSOF") refer to Plaintiff's Statement of Additional Facts that Require the Denial of Summary Judgment, filed herewith.

departments managed DMG's business and affairs, including, without limitation:

- President of the Board of Directors (the "Board") Paul Merrick, MD ("Dr. Merrick)
- Chief Executive Officer Michael Kasper ("Kasper")[2]
- Chief Financial Officer Michael Pacetti ("Pacetti")
- Chief Operating Officer Dennis Fine ("Fine")
- Dermatology Department Chair and CityGate Site Leader Ashish Bhatia, MD ("Dr. Bhatia)
- Executive Director of Human Resources Deborah Tate ("Tate")
- Medical Director Soujanya "Chinni" Pulluru, MD ("Dr. Pulluru")
- Director of Risk Management Jennifer Groszek ("Groszek") and
- Various other managers and employees in the Risk Management Department, Credentialing Department, and Human Resources ("HR") Department.

(DSOF ¶ 6)[3] DMG created a bureaucracy of department chairs and site leaders that it empowered to drive clinical results for its patients and to which the Board delegated physician hiring and firing decisions. (PSOF ¶ 2; DSOF ¶ 8)[4]

DMG's employees used the term "C-Suite" to refer to various individuals serving corporate administrative functions, including, Dr. Merrick, Kasper, Pacetti, Fine, Chief Administrative Officer Krishna Ramachandran ("Ramachandran"), Dr. Pulluru, Tate, and Executive Director of Marketing Maria McGowan, among others. (DSOF ¶ 11) Physicians had little or no direct communication with, or day-to-day oversight from, the C-Suite or the Board who worked from DMG's corporate headquarters in Downers Grove, Illinois. (PSOF ¶ 5) Neither the Board nor the C-Suite told physicians which patients to treat, the number of patients to treat, or which hours or days to work. (Id. at ¶ 9) Rather, physicians were free to set their own schedules. (Id.)

In the summer of 2011, Dr. Bhatia, CityGate dermatologist Jeffrey Hsu, MD ("Dr. Hsu"), Practice Manager Susan Ruggio ("Ruggio"), Dr. Merrick, Kasper, and Fine, among others,

---

[2] Plaintiff was scheduled to depose Kasper in June 2019, but he passed away in May 2019.

[3] Citations to Defendant's Statement of Facts ("DSOF") refer to Plaintiff's responses to, and the undisputed portions of, DMG's statement of facts as set forth in Plaintiff's Responses to Defendant's Statement of Material Facts, filed herewith.

[4] Dr. Pulluru and Tate also played key roles in physician human resources decisions. (DSOF ¶ 8)

interviewed Dr. Stankiewicz. (<u>Id</u>. at ¶ 3) Dr. Bhatia made an offer of employment to her on behalf

of DMG. (<u>Id</u>.) Thereafter, Dr. Stankiewicz and DMG entered into an employment agreement (the

"Employment Agreement") that set forth certain terms and conditions of Dr. Stankiewicz's

employment, some of which were later modified in the First Amendment to Employment

Agreement. (<u>DSOF</u> ¶¶ 13-14, 19)

The Employment Agreement does not set forth procedures for resignation and termination.

(<u>Id</u>. at ¶ 14)  Rather, Section 1.3 merely states,

> Physician shall perform all professional, medical and administrative services
> assigned to Physician by the Medical Group in accordance with such policies,
> procedures, rules and regulations as the Medical Group may establish from time to
> time.

(<u>Id</u>.) Section 3.1 provides the conditions under which either party has the right to terminate, not

the administrative procedures for resignation or termination. (<u>Id</u>.) It provides that "[e]ither party

may terminate this Agreement with or without cause upon ninety (90) days prior written notice."

(<u>Id</u>. at ¶ 15) Section 12.1 also does not set forth administrative procedures but states:

> <u>Notices</u>.  All notices or other communications under this Agreement shall be
> deemed "given" (i) upon personal delivery to the recipient, (ii) when sent by
> facsimile transmission, or (iii) the first business day after it is sent by air express
> courier service, addressed in any case to the recipient at the address set forth
> beneath his or its signature below (or such other address as the recipient may
> hereafter designate by notice given in the foregoing manner).  All notices or
> communications to the Medical Group shall be delivered or mailed to the attention
> of its President and its Chief Executive.

(<u>Id</u>. at ¶ 16) (the "Notice Provision")

On September 1, 2013, Dr. Stankiewicz bought 1,000 class A common shares in DMG

pursuant to the Amended and Restated Shareholder Agreement (the "Shareholder Agreement"). (<u>Id</u>.

at ¶ 19) Section 2 of the Shareholder Agreement states, in relevant part:

> <u>Occurrences Causing Purchase of Shares and Purchase Price</u>.  The Shares shall be
> automatically redeemed by the Clinic and shall no longer be deemed outstanding

3

for any reason upon the occurrence of any one of the following events:

[…]

(c)     The termination of the Shareholder with the Clinic for any reason;

(d)     The decision of the shareholder to terminate his interest in the Clinic as a Shareholder; or

(e)     The decision of the Board of Directors of the Clinic to terminate the interest of a Shareholder in the Clinic.

The purchase price for the Shares of a Shareholder pursuant to this Section 2 shall be their original purchase price plus the amount of any subsequent additional capital contributions made by such Shareholder to the Clinic.

(Id. at ¶¶ 20-21)

From September 1, 2011 to July 31, 2017, Dr. Stankiewicz worked as a dermatologist at DMG's CityGate site in Naperville, Illinois and reported directly to Dr. Bhatia. (PSOF ¶ 4) In her nearly six years of employment, other than her interview, she never directly communicated with Dr. Merrick, Kasper, Pacetti, Fine, or any other member of the C-Suite. (Id. at ¶ 6) Instead, she, along with other physicians at CityGate, such as Dr. Hsu, relied on Dr. Bhatia and Ruggio to communicate corporate policies, directives, decisions, and procedures. (Id.) For example, when Dr. Stankiewicz took maternity leave, Ruggio had the leave approved and patients rescheduled. (Id.) When Dr. Stankiewicz required new equipment, Ruggio had it approved and purchased. (Id.)

Ruggio was Practice Manager of CityGate and two other dermatology sites. (DSOF ¶ 27) Her duties included managing 53 staff members, patient schedules, administrative issues, and physician HR issues for her sites. It was Ruggio's duty to communicate DMG's corporate policies (including HR policies), decisions, directives, and procedures to physicians, and to help physicians interpret and work within organizational parameters. (Id.) She attended quarterly manager meetings at DMG's corporate headquarters and communicated policies and directives distributed

at the meetings to physicians. (Id.) As Practice Manager for Dr. Bhatia, she took notes at dermatology department meetings and distributed them to the department physicians and staff. (Id.) Ruggio also interviewed dermatology physicians and let them know how the practice operated. (Id.) She made recommendations to headquarters about which physicians to hire. (Id.) She facilitated physician credentialing by collecting information from physicians and passing it to the Credentialing Department. (Id.) She was responsible for closing physicians' schedules and rescheduling their patients when they took FMLA leave. (Id.)

DMG told its employees that its top business initiative was to provide patients with access to quality care when they need it, which meant making it easier for patients to see physicians faster. (PSOF ¶ 16) One of Ruggio's duties was to improve patient access to care. (Id. at ¶ 17) She did not require prior approval from the Board or C-Suite before putting patients on Dr. Stankiewicz's schedule but was expected to use her best judgment and discretion to make decisions that benefitted DMG and its patients. (Id.) Ruggio was never told that she acted outside the scope of her authority and never received a negative performance evaluation. (Id.) DMG even offered her a 25% retention bonus when she resigned in December 2017, but she declined to accept it. (Id.)

In early 2017, Dr. Stankiewicz decided to move to Park City, Utah to open her own clinic. (DSOF ¶¶ 25-26) On April 24, she asked Ruggio how to tender her resignation, and Ruggio told her to send a notice to Dr. Bhatia "as dept. [sic] chair and site leader" and "he will forward on." (PSOF ¶ 10) On May 1, Dr. Stankiewicz tendered her resignation to Dr. Bhatia and Ruggio via email with an effective date at the "end of July." (PSOF ¶ 11; DSOF ¶ 31) Months later, on July 31, Kasper emailed Dr. Stankiewicz that DMG accepted the May 1 resignation, even though it was not tendered in strict compliance with the Notice Provision. (PSOF ¶ 37; DSOF ¶ 33) Before that, the C-Suite never told her that her last day would be July 31. (PSOF ¶¶ 11, 37; DSOF ¶ 33)

On July 19, Dr. Stankiewicz learned there would be a two-month delay in the construction of her Park City clinic. (PSOF ¶ 12) She also knew that, despite her efforts, Ruggio was unable to reschedule hundreds of her patients after she had given her notice of resignation in May, some of whom were being treated for cancer and other serious diseases. (PSOF ¶ 12; DSOF ¶ 39) Due to the construction delay, Dr. Stankiewicz decided that she wanted to work for DMG through at least August to treat as many of her waitlisted patients as possible before she moved. (PSOF ¶ 13; DSOF ¶ 49) In accordance with DMG's patient access initiative, the extension of Dr. Stankiewicz's employment would permit DMG to treat and collect revenue from patients that Ruggio had not been able to reschedule due to the Dermatology Department being fully booked. (PSOF at ¶ 18)

On the morning of July 24, Dr. Stankiewicz received permission from Dr. Bhatia to extend her employment through August 31, 2017. (Id. at ¶ 14) She believed that Dr. Bhatia would and did contact those with authority in the C-Suite on her behalf as he had done when she tendered her notice of resignation to him in May. (DSOF ¶¶ 45-47) Dr. Stankiewicz also asked Ruggio how to extend her employment, and Ruggio told her she would contact the necessary people at headquarters to see if it was possible and to get the proper approval. (PSOF ¶ 14; DSOF ¶¶ 47-48)

At the time, DMG did not have a process or policy on the extension of a physician resignation date, and if did, Ruggio was unaware of it. (PSOF ¶ 34; DSOF ¶ 48) Accordingly, that morning, Ruggio emailed Credentialing Specialist Sharon McGuire ("McGuire") and HR Manager Tunisia Hopkins ("Hopkins") and asked them whether it was possible for Dr. Stankiewicz to stay until the end of August and work three days per week during that month, and, if they were not the right people to ask, to forward the email to the appropriate parties. (PSOF ¶ 15)[5] Neither McGuire nor Hopkins replied that the change in departure date was impossible or that the request should be

---

[5] Hopkins provided HR support to Ruggio on questions of physician terminations. (DSOF ¶ 53)

directed to another party. (Id.) Instead, that same day, McGuire replied by email and copied Hopkins, Groszek, Credentialing Manager Claudia Sagredo, Credentialing Clerk Marie Anderson, and Marsh Client Representative (*i.e.*, DMG's malpractice carrier) Renate Bayer:

> I can forward this information to our Malpractice Carrier in order to keep her coverage. I can also notify the hospitals. I will need her exact date of depature [sic]. The Health Plans have already been notified. Marie will notify the Health Plans that there has been a change in departure.

(Id.) Those who received McGuire's email, including Groszek, Hopkins, and Ruggio, believed that the appropriate parties with authority approved the change in departure. (Id. at ¶¶ 15, 22)

On July 24, based on McGuire's email to her, Ruggio told Dr. Stankiewicz that she had notified all necessary and appropriate parties of the change in departure date, that DMG approved the change, that her August schedule was open, and that her malpractice insurance and IT access to patient records were extended. (Id. at ¶ 19) By 10:30 a.m. that morning, Dr. Stankiewicz saw that patients were being put on her August schedule. (Id.) Based on this, Dr. Stankiewicz, and others, including Dr. Bhatia, Dr. Hsu, and Ruggio, believed that DMG was on notice and approved of the extension of her employment. (Id. at ¶ 21)

The same day, Dr. Bhatia emailed Dr. Stankiewicz, "Cool! Looks like [Ruggio] made it happen!" and forwarded to her an email from Ruggio to all dermatology physicians and staff stating that her schedule would be open through the end of August. (Id.) Also that day, Groszek emailed Dr. Pulluru that "Dr. Stankiewicz's last day is now 8/31" to which Dr. Pulluru replied, "Figured:)" (Id. at ¶ 22)[6] On July 25, the Credentialing Department emailed the Payroll, Marketing, and HR Departments a form indicating that Dr. Stankiewicz's effective leave date was

---

[6] As Medical Director, Dr. Pulluru played a key role in physician HR decisions and was also charged with tallying shareholder votes to ensure that at least two-thirds voted for the Transaction. (PSOF ¶ 23) This put her in constant communication with Kasper and Fine between July 24 and 27 about the status of Dr. Stankiewicz's employment and vote. (Id.) Yet, Dr. Pulluru never asked Kasper or Fine about the extension of Dr. Stankiewicz's employment. (Id.)

"8/31/2017." (Id. at ¶ 24) On July 26, DMG informed its hospitals and health plans that Dr. Stankiewicz's last day would be "8/31/17." (Id. at ¶ 25)

Also on July 26, Dr. Stankiewicz emailed Ruggio to confirm her understanding that Ruggio had contacted the appropriate parties and that DMG had granted the extension of employment. (Id. at ¶ 20) Ruggio replied to Dr. Stankiewicz's email, in relevant part,

> Glad you will be here for another month. I did submit everything to the appropriate parties with an end date of 8/31. I worked with Claudia Segredo [sic] the credentialing manager who walked me through the appropriate steps in notifying everyone of the change from 7/31 to 8/31. Happy to have you with us for a little longer.

(Id.)

On July 27, CityGate Support Staff member, Cindy Marks ("Marks"), forwarded to Dr. Stankiewicz an email from the Boncura I&T Service Desk confirming her "end date of 8/31/2017 and not 7/31/2017," and stating that she was "all set until 8/31/17," HR was "processing this information" and IT was extending her access to patient records "through 8/31/2017." (Id. at ¶ 26) When she forwarded the email to Ruggio the same day, Ruggio replied, "This was all submitted through Claudia in credentialing along with the online form that goes to all depts." (Id. at ¶ 26) Then, between July 24 and 27, DMG put 261 patients on Dr. Stankiewicz's August schedule. (Id. at ¶ 27) For 49 of those patients, Dr. Stankiewicz personally changed their treatment plan in reliance of the fact that DMG had extended her employment. (Id. at ¶ 28)

In mid-July, Dr. Stankiewicz received notices of a July 27 special meeting of shareholders stating: (i) shareholders would vote on DMG's decision to sell its equity interests in DMG Practice Management Solutions LLC ("DMG PMS") to affiliates of Ares Management LLC ("Ares") (the "Transaction"); (ii) as a shareholder on July 7, 2017, she held the right to dissent to the Transaction; and (iii) the deadline to vote or dissent was July 27, 2017. (PSOF ¶ 28; DSOF ¶ 41)

On July 14, Dr. Stankiewicz went on vacation, during which time DMG posted Transaction materials on a DMG server only accessible from an on-site computer. (<u>DSOF</u> ¶ 42) After she returned from vacation and DMG had extended her employment, on July 24, Dr. Stankiewicz reviewed the materials, but they did not disclose the close date or explain employment terms. (<u>PSOF</u> ¶ 29; <u>DSOF</u> ¶ 42) Neither DMG nor Dr. Stankiewicz knew when the Transaction would close until it did, and shareholders were told it could close as late as September 29. (<u>PSOF</u> ¶ 32)

As of July 24, Dr. Stankiewicz did not understand if her employment affected her right to participate in the Transaction. (<u>Id</u>. at ¶ 29) Thus, she emailed a question on employment terms to a DMG Transaction account but only received an automated reply. (<u>Id</u>. at ¶ 30) So, on July 26, she retained a law firm for advice on her right to dissent. (<u>Id</u>.) The attorneys advised her to dissent to the Transaction and told her she did not have to be an employee on the Transaction close date to receive the fair value of her shares. (<u>Id</u>. at ¶ 31) They advised her, and she believed, that she could tender her dissent while she was an employee and recover the fair value of her shares even if she was not an employee when the Transaction closed. (<u>DSOF</u> ¶ 42) On July 27, Dr. Stankiewicz emailed Dr. Merrick and Kasper the notice of dissent prepared by her attorneys. (<u>PSOF</u> ¶ 33)

After learning that Dr. Stankiewicz dissented, DMG breached its previous agreement to extend her employment through August 31. (<u>DSOF</u> ¶¶ 57-63) Prior to July 27, there was no process, policy, or procedure on extending a physician's resignation date, but, for the first time on July 27, DMG instituted a policy, as distributed by Fine to, *inter alia*, Ramachandran, that "[m]oving forward, any change in a physician termination date must be approved by Kasper, Pacetti, Fine, or [COO David] Spaccarelli." (<u>PSOF</u> ¶ 11) Then, late on July 27, Ruggio forwarded to Dr. Stankiewicz an email in which Groszek informed Ruggio that the "C-Suite" did not approve the extension of employment. (<u>Id</u>. at ¶ 35) But, no one from the C-Suite contacted Dr. Stankiewicz

to tell her the extension was no longer approved. (Id.) As a result, Dr. Stankiewicz emailed Kasper on July 28 (copying those that were on the July 27 email from Groszek to Ruggio) that DMG had already approved the extension and she would continue to see the over 200 patients on her August schedule. (Id. at ¶ 36) Kasper only replied that DMG would respond to her shortly. (Id.)

By July 30, DMG was still silent, which prompted Dr. Stankiewicz to send an "urgent" email to Kasper stating that she wanted to see her patients as previously agreed because their care was her priority and should be DMG's priority. (Id. at ¶¶ 11, 37) When Kasper finally replied on July 31, he said, *for the first time since she tendered her resignation*, that it would be her last day seeing patients, claimed that she had interrupted a "months-long" transition plan, and also maintained that there was a supplemental transition plan to accommodate the patients on her "August schedule during the month of August." (Id.) However, many witnesses testified that DMG never created a transition plan or supplemental transition plan for the continued care of Dr. Stankiewicz's patients, and they were not seen in August as Kasper claimed. (Id. at ¶ 38) After DMG breached the July 24 agreement, Dr. Stankiewicz's last day was July 31. (DSOF ¶ 62)

On August 1, DMG tried to deposit $11,000 into Dr. Stankiewicz's bank account, but she returned the money and later sued to enforce her rights under the IBCA. (PSOF ¶ 39)[7] The Transaction closed on August 15, and DMG sold its interest in DMG PMS to an affiliate of Ares. (DSOF at ¶¶ 41, 66) DMG never sent Dr. Stankiewicz its statement of opinion of the estimated fair value of her shares, latest balance sheet, statement of income, and interim financial statements, or a commitment to pay the estimated fair value of her shares. (PSOF ¶ 40) DMG also has not paid Dr. Stankiewicz the fair value of her shares, plus accrued interest. (Id.)

---

[7] Dr. Stankiewicz denies that the fair value of her shares is $11,000. When the Transaction closed, DMG's enterprise value was $1.45 billion, and it received $405 million for its interest in DMG-PMS. (DSOF ¶ 65) Thus, as one of 409 shareholders, the value of her 1,000 shares is likely closer to $1 million. (Id.)

## III.     ARGUMENT

### A.     Standard of Review

On summary judgment, the nonmoving party must establish some genuine issue for trial so a reasonable jury could return a verdict in her favor. *SMK Assocs., LLC v. Sutherland Glob. Servs., Inc.*, 14-C-284, 2016 WL 5476256, at *2 (N.D. Ill. Sept. 29, 2016). The non-moving party receives the benefit of conflicts in evidence and reasonable inferences drawn from them. *Id.*

### B.     Dr. Stankiewicz was a shareholder when the Transaction was consummated.

DMG argues that it accepted Dr. Stankiewicz's May 1 resignation and did not have an obligation to rescind the acceptance. However, this ignores the multitude of ensuing facts that show DMG's agents bound it to a subsequent valid agreement to extend her employment. Dr. Stankiewicz ran the request to extend her employment up the usual and customary chain of command, and she received confirmation from those with authority to communicate employment decisions on DMG's behalf that the appropriate parties had approved the one-month extension of her employment.[8] In the alternative, DMG ratified the agreement. Thus, DMG's citation to cases for the proposition that an employer may refuse a withdrawal of resignation simply do not apply.

"For an agent's actions to bind the principal, the agent must have either actual authority, apparent authority, or the principal must ratify the agent's actions." *SMK*, 2016 WL 5476256, at *2. A corporate agent's authority is effective if the board of directors places the individual in a position that carries the inherent authority to act for the corporation in certain transactions. *Evanston Bank v. Conticommodity Servs., Inc.*, 623 F. Supp. 1014, 1031-32 (N.D. Ill. 1985). If the corporate agent's authority is based on ratification, it is binding where the board of directors knew or should have known all material facts and behaved in a way that implied ratification. *Id.* at 1032;

---

[8] DMG argues that Dr. Stankiewicz admits that Ruggio lacked actual authority to extend her employment, but those involved, including Ruggio herself, believed that others with authority did approve the extension.

*see also Vertex Refining, NV, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 374 F. Supp. 3d 754, 769–70 (N.D. Ill. 2019) (when the principal is a corporation, agency law assumes that it knows what its employees know). Agency is "a notoriously fact-bound question[.]" *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014).

### 1. Those with apparent authority to communicate DMG's employment decisions bound DMG to the agreement with Dr. Stankiewicz.

Apparent authority exists if: (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) the third person reasonably concluded, based on the actions of the principal and agent, that the party was an agent of the principal; and (3) the third person justifiably relied on the agent's apparent authority to her detriment. *SKF USA, Inc. v. Bierkness*, 636 F. Supp. 2d 696, 707-08 (N.D. Ill. 2009). Apparent authority exists when a principal allows the public to deal exclusively with the agent. *Lundberg v. Church Farm, Inc.*, 151 Ill. App. 3d 452, 462, 502 N.E.2d 806, 813 (2d Dist. 1986). Apparent authority "may be presumed from silence of the alleged principals when they knowingly allow another to act for them as their agent." *Mohawk Spring Div. of MW Indus., Inc. v. ZD Integrated Circuits, Inc.*, 17-CV-9227, 2018 WL 6493327, at *5 (N.D. Ill. Dec. 10, 2018). Whether a person has apparent authority is a question of fact. *Hofner v. Glenn Ingram & Co.*, 140 Ill. App. 3d 874, 882, 489 N.E.2d 311, 316 (1st Dist. 1985).

### a. Hopkins and McGuire possessed apparent authority to communicate DMG's acceptance of the contract extension.

A trier of fact can reasonably conclude that DMG put Hopkins and McGuire in positions of authority to act and speak for DMG about the change in Dr. Stankiewicz's departure date. McGuire was a credentialing specialist who coordinated licensing and malpractice coverage for DMG. (DSOF ¶ 52) Hopkins was an HR Manager who provided support to Ruggio on questions of physician terminations. (Id. at ¶ 53) Thus, DMG consented to, or acquiesced in, their authority to coordinate and communicate with Ruggio on physician licensing, malpractice, and HR matters.

12

Ruggio testified there was no procedure to extend a physician's resignation date. (PSOF ¶¶ 5, 34; DSOF ¶ 48) As a result, she asked Hopkins and McGuire whether it was possible for Dr. Stankiewicz to stay until the end of August, and, if they were not the right people to ask, to forward the email to the appropriate parties. (PSOF ¶ 15) McGuire and Hopkins did not indicate a lack of authority. (Id.) To the contrary, in her email to Ruggio, Hopkins, Groszek, and several others, McGuire was definitive that, "there has been a change in departure" and Dr. Stankiewicz's credentialing and malpractice coverage would be extended. (Id.) Those who received McGuire's email, including Ruggio, Hopkins, and Groszek, reasonably believed that those with authority approved the new departure date. (Id. at ¶¶ 15, 22) Ruggio relied on McGuire's statements in communicating to Dr. Stankiewicz that DMG had approved the extension of her employment. (Id. at ¶¶ 19-21) Thus, a trier of fact can conclude that Ruggio reasonably believed McGuire and Hopkins had authority to speak and act for DMG when they conveyed that DMG had changed Dr. Stankiewicz's end date, extended her malpractice insurance, and notified hospitals and health plans of the change in her departure date.

### b. Dr. Bhatia and Ruggio possessed apparent authority to communicate DMG's acceptance of the contract extension.

DMG affirmatively placed Dr. Bhatia and Ruggio in managerial positions that led Dr. Stankiewicz to believe that DMG had given them complete control of its dealings with her, especially as it concerned the communication of employment matters. Dr. Stankiewicz never directly communicated with the C-Suite. (PSOF ¶¶ 6-8) Instead, DMG gave Dr. Bhatia and Ruggio *carte blanche* to manage every aspect of the parties' relationship. (Id)

Dr. Bhatia was the Dermatology Department Chair and CityGate Site Leader to whom the Board delegated physician employment decisions and granted the discretion to drive clinical results for patients. (PSOF ¶ 2; DSOF ¶¶ 6-7, 11, 32) After interviewing her, Dr. Bhatia extended

13

an offer of employment to Dr. Stankiewicz, and thereafter she reported to him. (PSOF ¶¶ 3-4)

Ruggio was the Practice Manager of three dermatology sites. (DSOF ¶ 27) She interviewed Dr. Stankiewicz and was responsible for letting her know how the practice operated. (PSOF ¶ 3; DSOF ¶ 27) She had complete control over Dr. Stankiewicz's patient scheduling, credentialing, maternity leave, and equipment purchases. (PSOF ¶¶ 6, 9; DSOF ¶ 27) Because Dr. Stankiewicz had no contact with the C-Suite, Ruggio's duty was to notify her of corporate policies, decisions, and procedures. (PSOF ¶¶ 6-7) For example, when Dr. Stankiewicz wished to resign, Ruggio told her to submit the notice to Dr. Bhatia, which DMG claims it accepted. (Id. at ¶¶ 10-11, 37)

Similarly, when Dr. Stankiewicz wished to extend her employment, she sought and received permission from Dr. Bhatia. (Id. at ¶ 14) Because DMG did not have a process for changing a physician's resignation date, she asked Ruggio what needed to be done, and Ruggio said she would find out if the extension was possible and get the proper approval for her. (Id. at ¶¶ 14, 34) On July 24, Ruggio told Dr. Stankiewicz that DMG granted the extension, Dr. Bhatia told her that Ruggio "made it happen!", and Dr. Stankiewicz saw that patients were being put on her August schedule. (Id. at ¶¶ 19, 21)

Illinois law recognizes that apparent authority for a particular act may flow from a principal's general knowledge of and acquiescence to the routine conduct of its agent. *Hepp v. Ultra Green Energy Servs., LLC*, 13-C-4692, 2016 WL 1073070, at *5 (N.D. Ill. Mar. 18, 2016). What constitutes unusual or extraordinary conduct is normally one for the trier of fact since it depends on the facts and circumstances of the business, the agent's position, and the specific transaction. *Evanston Bank*, 623 F. Supp. at 1032. Here, DMG told its employees that its top business initiative was to provide patients with quick access to care. (PSOF ¶ 16) One of Ruggio's duties was to improve patient access to care, and she did not require prior approval from the Board

14

or C-Suite before putting patients on Dr. Stankiewicz's schedule. (PSOF ¶¶ 9, 17) Rather, she was expected to use her best judgment and discretion to make decisions that benefitted DMG and its patients. (Id.) Also, DMG failed to create a transition plan for the continued care of Dr. Stankiewicz's patients. (Id. at ¶ 38) Even with 90-days' notice, Ruggio could not find appointments for all of them. (Id. at ¶ 12) In accordance with DMG's patient access initiative, the extension of Dr. Stankiewicz's employment would permit DMG to treat and collect revenue from waitlisted patients. (Id. at ¶ 18) Indeed, Dr. Bhatia testified there was nothing extraordinary or non-routine about Dr. Stankiewicz's request to change her last day to treat waitlisted patients. (DSOF ¶ 42)

Consistent with DMG's delegation of broad authority to Dr. Bhatia and Ruggio to (i) completely manage Dr. Stankiewicz's dealings with DMG and (ii) to improve patient access to care, DMG stood silently by while 261 patients were put on Dr. Stankiewicz's schedule, even after Tate, Dr. Pulluru and Fine, members of the C-Suite, were notified on July 24 and 25 of the new departure date. (PSOF ¶ 22; DSOF ¶¶ 11, 56) As a natural result of that delegation, DMG entered into an enforceable agreement to extend Dr. Stankiewicz's employment. During the time that the C-Suite knew about the change in departure, Dr. Stankiewicz detrimentally relied on Dr. Bhatia and Ruggio's apparent authority because, between July 24 and 27, she personally changed 49 patient treatment plans in reliance of the fact that DMG agreed to extend her employment. (PSOF ¶ 27) Illinois supports the finding of apparent authority in this case. *See Loncarevic & Assocs., Inc. v. Stanley Foam Corp.*, 2017 IL App (1st) 150690, ¶ 37, 72 N.E.3d 798, 808 (finding apparent authority where the defendant's president gave its employee "broad authority" to do "what he thought was best," while he chose to "silently stand by and permit" the employee to perform his duties); *Lundberg*, 151 Ill. App. 3d at 462, 502 N.E.2d at 813 (finding apparent authority where the corporation placed its employee in a managerial position with complete control of its dealings

with the public). For these reasons, genuine disputes of material fact preclude a finding that DMG did not agree to extend Dr. Stankiewicz's employment, and summary judgment should be denied.

c.     <strong>Dr. Stankiewicz reasonably inquired into the scope of authority.</strong>

A third person dealing with a known agent must use reasonable diligence to verify the extent of the agent's authority measured by what persons of reasonable prudence and familiar with the business practices might rightfully believe the agent to possess based on the principal's conduct. *Gondeck v. A Clear Title & Escrow Exch., LLC*, 47 F. Supp. 3d 729, 740-41 (N.D. Ill. 2014). An agent's authority may be presumed from silence of the alleged principal when it knowingly allows it to act as their agent. *Id*. Whether a party exercised reasonable diligence in dealing with an agent is a question of fact. *Id*. at 742-43.

A reasonable trier of fact can conclude that Dr. Stankiewicz satisfied the duty to inquire. It was Ruggio's duty to relay corporate decisions and procedures to physicians. (DSOF ¶ 48) Using a process identical to the one she used to tender her resignation, Dr. Stankiewicz asked Ruggio what needed to be done to extend her employment, and Ruggio told her she would find out. (PSOF ¶¶ 10-11, 14) Then, Dr. Bhatia, the head of the Dermatology Department, told Dr. Stankiewicz that Ruggio had made the extension "happen" and forwarded an email conveying that her August schedule was open. (Id. at ¶ 21) That day, Dr. Stankiewicz saw patients being put on her August schedule. (Id. at ¶¶ 19-21) Even so, on July 26, Dr. Stankiewicz emailed Ruggio to confirm that the proper procedure for extending her resignation was followed and that the parties with authority approved. (Id. at ¶ 20) In response, Ruggio emailed Dr. Stankiewicz stating that she had submitted the request for extension to the "appropriate parties with an end date of 8/31. I worked with Claudia Segredo [sic] the credentialing manager who walked me through the appropriate steps in notifying everyone of the change from 7/31 to 8/31." (Id.) Between July 24 and 27, DMG put 261 patients on her schedule, extended her malpractice coverage and IT access, updated her termination date

16

in its computer system, and notified its hospitals and health plans of the new departure date. (Id. at ¶¶ 24-27) Thus, summary judgment is not proper here because a trier of fact can conclude that Dr. Stankiewicz lacked reason to question Dr. Bhatia and Ruggio's definitive statements that the "appropriate parties" (i.e., those with authority) granted the extension.

### d.    Dr. Stankiewicz did not breach the Notice Provision.

DMG argues that the Notice Provision required Dr. Stankiewicz to seek permission to extend her employment directly from Dr. Merrick and Kasper. But, DMG waived her strict compliance with the Notice Provision due to the parties' prior course of dealing.[9] Courts may imply waiver of a contract provision if a party shows by its conduct that compliance is not required. *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 673, 891 N.E.2d 1, 28 (1st Dist. 2007). Dr. Stankiewicz used the same method to notify DMG of her request to extend her departure date that she had used to resign. DMG claims it accepted her resignation, even though it was not tendered directly to Dr. Merrick or Kasper. DMG cannot seriously argue that the same method of notice was proper in one case but not the other. Its about-face as to what constitutes proper notice under the Employment Agreement creates an issue of material fact.

The Notice Provision also does not require Dr. Stankiewicz to personally deliver notices to Dr. Merrick and Kasper but merely provides that notices are deemed given when personally received by them. (DSOF ¶ 16) Although Dr. Stankiewicz did not personally tender the request to extend her employment to Dr. Merrick and Kasper, she reasonably believed that Dr. Bhatia would, and that he did, contact these members of the C-Suite on her behalf as he had done when she tendered her notice of resignation to DMG in the same manner, which DMG purportedly accepted. (Id. at ¶ 45); s*ee Lombardo v. Reliance Elevator Co.*, 315 Ill. App. 3d 111, 120, 733 N.E.2d 874,

---

[9] DMG's position is also inconsistent with the July 27 policy that "any change in a physician termination date must be approved by Kasper, Pacetti, Fine, or [COO David] Spaccarelli." (PSOF ¶ 34)

882 (1st Dist. 2000) (a principal has constructive notice of material facts known to its agent). DMG admits that Dr. Merrick and Kasper received notice of Dr. Stankiewicz's intent to extend her employment. (DSOF ¶¶ 56-57) Since DMG received actual notice, the object of the Notice Provision was accomplished, and Dr. Stankiewicz did not breach it. *See Dunkin' Donuts, Inc. v. Towns Family, Inc.*, 95-C-3666, 1995 WL 591454, at *4 (N.D. Ill. Oct. 4, 1995) (technical noncompliance with a notice provision is not a material breach if actual notice is received).

Finally, the Notice Provision is ambiguous, which raises an issue of fact about whether Dr. Stankiewicz breached it. *See Dunning v. Chem. Waste Mgmt., Inc.*, 91-C-2502, 1997 WL 222891, at *10 (N.D. Ill. Apr. 22, 1997) (when a contract is ambiguous, determining the materiality of a breach is a question of fact). It provides that "notice or communications to the Medical Group shall be delivered or mailed to the attention of its President and its Chief Executive" and that such notice

> shall be deemed "given" (i) upon personal delivery to the recipient, (ii) when sent by facsimile transmission, or (iii) the first business day after it is sent by air express courier service, addressed in any case to the recipient at the address set forth beneath his or its signature below.

(DSOF ¶ 16) However, the Employment Agreement does not define President or Chief Executive, does not identify the President or Chief Executive, is not executed by anyone purporting to be President or Chief Executive, and does not provide their address. (Id.) Thus, summary judgment should also be denied because of this contractual ambiguity.

### 2. Alternatively, DMG ratified the extension of employment.

If actual and apparent authority is lacking, a principal still may be bound by a contract entered into by its agent if the principal ratifies it. *Vertex*, 374 F. Supp. 3d at 769-70. Ratification "is a complex, fact-intensive inquiry." *Evanston Bank*, 623 F. Supp. at 1034. Ratification from silence is found when a principal, with full knowledge of all material facts, conducts itself in a manner inconsistent with repudiation of the agent's transaction, and a third party relies on that

18

conduct to his detriment. *Id*. Each element is a question of fact. *Id*. The parties' previous course of dealing is also relevant to the questions of fact involved. *Puroon, Inc. v. Midwest Photographic Res. Ctr., Inc.*, 16-C-7811, 2018 WL 5776334, at *8 (N.D. Ill. Nov. 2, 2018). "Although normally a principal's actual knowledge of the transaction is essential in determining ratification, one whose ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts will be estopped as if he had full knowledge of the facts." *SMK*, 2016 WL 5476256, at *3 (cite omitted).

A reasonable trier of fact could find that DMG ratified the extension of employment. DMG knew of its agents' communications to Dr. Stankiewicz about matters affecting the Employment Agreement, including her maternity leave, patient scheduling, equipment purchases, and resignation. (PSOF ¶¶ 4-11) DMG's C-Suite knew her employment was extended because Tate, Dr. Pulluru, and Fine were notified. (PSOF ¶ 22; DSOF ¶ 56) However, after receiving notice, the C-Suite failed to take immediate action to prevent 261 patients from being put on Dr. Stankiewicz's schedule *until after* she exercised her lawful right to dissent to the Transaction. (PSOF ¶ 27) There was also a lack of control on DMG's part related to the opening of her schedule, the extension of her malpractice insurance and IT access, and the notification to hospitals and health plans of the change in departure because DMG did not have a policy or procedure on extending a physician's end date. (Id. at ¶ 34) It was not until *after* DMG's agents bound it to agreement to extend her employment that, on July 27, DMG made the policy: "Moving forward, any change in a physician termination date must be approved by Kasper, Pacetti, Fine, or [COO David] Spaccarelli." (Id.)

A trier of fact could also infer by DMG's complete lack of control over the resignation and extension of employment process, its failure to have any formal policy or procedure on the extension of a physician's end date, and its implementation of the foregoing administrative steps to extend Dr. Stankiewicz's employment, that DMG took a position inconsistent with

19

nonaffirmation and was negligent in failing to learn material facts related to the agreement to extend Dr. Stankiewicz's employment until after she already had detrimentally relied on the extension by changing 49 patient treatment plans. (Id. at ¶ 27)

Finally, the parties' conduct shows that Dr. Bhatia and Ruggio acted within the scope of their authority when dealing with Dr. Stankiewicz about the extension of her employment. Dr. Stankiewicz reported directly to Dr. Bhatia. (Id. at ¶ 4) She tendered her notice of resignation to Dr. Bhatia and Ruggio by email, which DMG asserts that it accepted. (Id. at ¶¶ 11, 37) She extended her employment using the same method. (Id. at ¶ 14) Accordingly, DMG was negligent in failing to monitor Dr. Bhatia and Ruggio on matters involving the Employment Agreement. Thus, taking all inferences in Dr. Stankiewicz's favor, a genuine dispute of material fact exists on whether DMG ratified the extension of her employment.

For these reasons, a reasonable trier of fact can conclude that DMG was bound by the agreement to extend Dr. Stankiewicz's employment for a month, and, but for its breach of that agreement, she was a shareholder at the time the Transaction closed.

**C. DMG did not have the right to redeem Dr. Stankiewicz's shares.**

This Court has already rejected the notion that DMG had the ability to redeem Dr. Stankiewicz's shares at any time for any reason. (Memo. Op. & Order [DE 48], p. 7) Indeed, Section 2 of the Shareholder Agreement permits the automatic redemption and repurchase of shares only upon the occurrence of certain conditions precedent, three of which are relevant here:

(c)     The termination of the Shareholder with the Clinic for any reason;

(d)     The decision of the shareholder to terminate his interest in the Clinic as a Shareholder; or

(e)     The decision of the Board of Directors of the Clinic to terminate the interest of a Shareholder in the Clinic.

(DSOF ¶ 20)

DMG argues that Dr. Stankiewicz's decision to resign from DMG necessarily means that she decided to terminate her shareholder interest in DMG. The argument improperly conflates the termination of shareholder *employment* under (c) with the decision to terminate shareholder *interest* under (d) and (e), which the Shareholder Agreement treats as distinct conditions. Dr. Stankiewicz did not decide to terminate her interest in DMG at any time before her termination because, on July 27, she dissented to the Transaction to receive the fair value of her shares. (Id. at ¶ 34) DMG does not claim the Board decided to terminate her interest. Thus, neither (d) nor (e) triggered the automatic redemption and repurchase provision of the Shareholder Agreement.

Section 2(c) also does not apply because Dr. Stankiewicz did not terminate her employment with DMG until August 31. While she initially intended to resign at the "end of July", on July 24 she sought permission and received DMG's approval to extend her employment through August 31. (PSOF ¶¶ 11, 14-15, 19-22, 24-27) Nothing in the Employment Agreement, nor any DMG policy or procedure in effect at the time, precluded her from doing so. (PSOF ¶ 34) After learning that Dr. Stankiewicz dissented to the Transaction, DMG breached its previous agreement to extend her employment through August and her employment ended on July 31. (DSOF ¶¶ 57-63) To terminate her earlier, DMG had to give 90-days' notice, which required a majority vote of the Board. (Id. at ¶ 15) Neither notice nor a majority vote occurred. Thus, it is not plausible for DMG to argue that the breach of the July 24 agreement triggered the automatic redemption provision.

Finally, the Shareholder Agreement provides that only the express conditions precedent in Section 2 will trigger the automatic redemption and repurchase of the shares. (Id. at ¶¶ 20-21) ("[t]he Shares shall be automatically redeemed [...] *upon the occurrence of any one of the following events*"; "[t]he purchase price for the Shares of a Shareholder *pursuant to this Section 2* shall be their original purchase price[.]") (emphases added). A shareholder's exercise of the

IBCA's right to dissent is not a condition precedent under Section 2. Thus, a reasonable trier of fact can conclude that, while DMG attempted on August 1 to redeem Dr. Stankiewicz's shares for $11,000 under Section 2, the redemption was ineffective because, on July 24, DMG extended her employment to August 31, and, on July 27, she exercised her right to the dissent, as the IBCA lawfully permits her to do. Thus, summary judgment should be denied.

### D. The unclean hands doctrine does not bar Dr. Stankiewicz's claim.

The unclean hands doctrine only bars equitable remedies and does not affect legal rights. *Zahl v. Krupa*, 365 Ill. App. 3d 653, 658, 850 N.E.2d 304, 310 (2d Dist. 2006). Dr. Stankiewicz seeks to enforce the legal remedy of money damages as provided in Section 11.70 of the IBCA, *i.e.*, the payment of the fair value of her shares. Thus, the doctrine does not apply.

However, even if the doctrine applies (and it does not), summary judgment is improper. DMG bears the burden to prove that Dr. Stankiewicz's alleged misconduct rose to a level of fraud or bad faith. *See Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶¶ 83, 85, 129 N.E.3d 128, 148. The court must look to the intent of a party to determine if it acted with unclean hands, which presents an issue of fact. *Id.*; *see also Profit Mgmt. Dev., Inc. v. Jacobson, Brandvik & Anderson, Ltd.*, 309 Ill. App. 3d 289, 303, 721 N.E.2d 826, 837 (2d Dist. 1999).

Taking all reasonable inferences in favor of Dr. Stankiewicz, a trier of fact can conclude that she did not act in bad faith or with intent to defraud DMG in seeking to extend her employment. DMG relies on two innocuous conversations that Dr. Stankiewicz had with Dr. Hsu and her husband as the sole basis of its unclean hands defense.[10] At best, DMG can demonstrate that one of three reasons she extended her departure date was to learn more about the Transaction. However, there is nothing fraudulent regarding an intent to learn more about the IBCA's lawful

---

[10] Dr. Stankiewicz disputes DMG's interpretation of these conversations in her Declaration. (PSOF Ex. C ¶¶ 49-50)

right to dissent. In any case, Dr. Stankiewicz did not seek to extend her employment through August to receive a personal financial benefit from the Transaction. (DSOF ¶ 49) Shareholders were advised that the Transaction could close as late as September 29, 2017. (PSOF ¶ 32) If Dr. Stankiewicz acted in bad faith, then she would have sought to extend her employment through September. In reality, Dr. Stankiewicz sought to extend her employment in good faith because: (i) she discovered that the construction of her clinic was delayed; (ii) she wanted to treat her waitlisted patients; and (iii) she wanted to learn more about the Transaction. (DSOF ¶ 49)

Dr. Stankiewicz did not attempt to conceal the extension of her employment. Rather, she reasonably believed that Dr. Bhatia and Ruggio would and did contact the Board and C-Suite on her behalf as they had when she tendered her notice of resignation to them in May. (Id. at ¶¶ 46, 54) Moreover, multiple members of the C-Suite knew of the change in departure but sat silently by while 261 patients were loaded onto her August schedule (PSOF ¶¶ 15, 22; DSOF ¶ 56)

Dr. Stankiewicz also did not believe that she had to be employed when the Transaction closed in order to dissent and receive the fair value of her shares because her attorneys advised her, and she believed, that she could dissent while employed and be entitled to the fair value of her shares regardless of her employment status when the Transaction closed. (PSOF ¶ 31)

Finally, the doctrine of unclean hands is unavailable to DMG because it acted in bad faith. "It is a basic maxim of equity that he who seeks equity must do equity." *Gambino v. Boulevard Mortg. Corp.*, 398 Ill. App. 3d 21, 60, 922 N.E.2d 380, 416 (1st Dist. 2009). DMG retaliated against Dr. Stankiewicz for dissenting to the Transaction by breaching the agreement to extend her employment, and its theory that she concealed the extension of her employment is a mere pretense. (DSOF ¶ 46) For these reasons, the unclean hands doctrine does not bar Dr. Stankiewicz from the legal remedies under Section 11.70 of the IBCA, and summary judgment should be denied.

### E. The Statute of Frauds does not bar Dr. Stankiewicz's claim.

DMG incorrectly posits that since the Employment Agreement is within the Statute of Frauds, the agreement to extend Dr. Stankiewicz's employment must also be within it.[11] DMG's premise is false because the Employment Agreement itself is not within the Statute of Frauds. The Statute of Frauds only prohibits oral contracts that cannot be performed within one year of their making. *Robinson v. BDO Seidman, LLP*, 367 Ill. App. 3d 366, 370, 854 N.E.2d 767, 772 (1st Dist. 2006). In Illinois, an at-will employee is one that may be discharged by the employer at any time for any reason. *Walker v. Ingersoll Cutting Tool Co.*, 915 F.3d 1154, 1158 (7th Cir. 2019). At-will employment contracts are outside the Statute of Frauds because either the employee's resignation or termination within a year can cause the contract to be performed in under a year. *Krieger v. Adler, Kaplan & Begy*, 94-C-7809, 1997 WL 323827, at *9 (N.D. Ill. Jun. 11, 1997) (string cites omitted); *see Clark v. Walker*, 04-C-941, 2004 WL 2967105, at *3 (N.D. Ill. Nov. 30, 2004) (at-will employment contracts are capable of performance within one year).

Here, the Employment Agreement is at-will because it permits either party to terminate with or without cause upon 90 days' notice. (DSOF ¶ 15) Also, even if not at-will, its duration is still under a year because, if not earlier terminated earlier by either party, the term is automatically renewed on September 1 each year for 364 days, starting on September 1 and ending on August 31. (Id. at ¶ 14) For these reasons, the Employment Agreement can be performed within a year, and the Statute of Frauds does not apply to subsequent oral modifications, such as the agreement to extend Dr. Stankiewicz's resignation date.

---

[11] DMG's citation to *Zusy v. Int'l Med. Group, Inc.*, 500 F. Supp. 2d 1087, 1096 (S.D. Ind. 2007) for this proposition is unavailing because it applied Indiana law.

Moreover, even if the statute of fraud applies (and it does not), Ruggio's July 26 email and Mark's July 27 email to Dr. Stankiewicz constitute signed writings evidencing DMG's July 24 agreement to extend Dr. Stankiewicz's employment. (PSOF ¶¶ 20, 26) "A writing sufficient to satisfy the Statute of Frauds need not itself be a valid contract, but only evidence of one." *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 549 (7th Cir. 2005) (int. quote and cites omitted). An email will suffice. *See Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 295-96 (7th Cir. 2002) (emails satisfy the writing and signature requirements); *accord Cent. Ill. Light Co. v. Consolidation Coal Co.*, 235 F. Supp. 2d 916, 919 (C.D. Ill. 2002) (citing cases). That Dr. Stankiewicz testified there was an oral agreement and not a formal written contract does not change that result or amount to a concession that a signed writing does not exist. For these reasons, DMG cannot establish that the Statute of Frauds renders the July 24 agreement to extend Dr. Stankiewicz's employment unenforceable, and summary judgment should be denied.

## IV.   CONCLUSION

Giving the benefit of conflicts of evidence to Dr. Stankiewicz, genuine disputes of material fact preclude summary judgment. Any single issue would suffice but, taken in their totality, the following seven (7) issues warrant the denial of summary judgment: (i) whether McGuire and Hopkins possessed apparent authority; (ii) whether Dr. Bhatia and Ruggio possessed apparent authority; (iii) whether Dr. Stankiewicz reasonably inquired into the scope of authority; (iv) whether Dr. Bhatia and Ruggio's conduct was unusual or extraordinary; (v) whether the Notice Provision required strict compliance; (vi) whether DMG ratified the extension of employment; and (vii) whether Dr. Stankiewicz had fraudulent intent in seeking to extend her employment. In addition, DMG's affirmative defenses do not apply. Thus, at this stage, DMG is not entitled to a legal determination that it is not bound to the agreement to extend Dr. Stankiewicz's employment, and summary judgment should be denied.

25

DATED:      October 22, 2019           Respectfully submitted,

Kelly Stankiewicz, MD, FAAD


By: _s/ *Brianna M. Skelly*_____.
    One of Her Attorneys


William J. Serritella, Jr. (#6210001)
wserritella@taftlaw.com
Brianna M. Skelly (#6298677)
bskelly@taftlaw.com
Nicollette L. Khuans (#6320914)
nkhuans@taftlaw.com
Taft Stettinius & Hollister LLP
111 E. Wacker Dr., Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile:  (312) 527-4011
*Counsel for Plaintiff*

26001567.9