# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KELLY STANKIEWICZ, MD, FAAD, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 18 C 3823<br>)<br>) Judge John Z. Lee |
| DUPAGE MEDICAL GROUP, LTD., d/b/a DUPAGE MEDICAL GROUP, an Illinois corporation, | )<br>)<br>)<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

For Plaintiff Dr. Kelly Stankiewicz, a month makes all difference. If her employment at Defendant DuPage Medical Group ("the Group" or "DMG") ended on July 31, 2017 (as the Group claims), the Group would have enjoyed the right to redeem her ownership shares for just $11,000. On the other hand, if Stankiewicz secured permission from the Group to stay on for a few more weeks thereafter (as she claims), the value of her shares would have soared to approximately $1 million.

Convinced that the Group agreed to delay her departure from the medical practice, Stankiewicz seeks a declaratory judgment that the Group failed to pay a fair value for her shares, in violation of the Illinois Business Corporation Act, 805 ILCS 5/1.01 *et seq*. In response, the Group has moved for summary judgment. Because a reasonable trier of fact could find in Stankiewicz's favor, however, the motion is denied.

## I. Background[1]

### A. Stankiewicz's Role at the Group

The Group employs over 700 physicians at 120 locations in the Chicago area. Pl.'s Stmt. Additional Facts ("SOAF") ¶ 1, ECF No. 74. Starting in 2011, Stankiewicz worked as a dermatologist at the Group's Naperville office. Def.'s Stmt. Material Facts ("SOF") ¶ 13, ECF No. 69; SOAF ¶ 4. She reported to Dr. Ashish Bhatia, the physician-site leader for that office. SOF ¶ 32; SOAF ¶ 4.

At the outset, Stankiewicz and the Group entered into an Employment Agreement authorizing either party to terminate her employment with "ninety days prior written notice." Def.'s Ex. 2-A, Employment Agreement § 3.1(c), ECF No. 69-16. The Agreement also specified that "[a]ll notices or communications to the Medical Group shall be delivered or mailed to the attention of its President or its Chief Executive" ("CEO").[2] *Id*. § 12.1.

Two years after she started, Stankiewicz acquired 1,000 common shares in the Group. SOF ¶¶ 19–22. In doing so, she signed a Shareholder Agreement acknowledging that the shares "shall be automatically redeemed" by the Group if certain events occurred, including:

(c) The termination of employment of the Shareholder with the

---

[1] The following facts are undisputed or have been deemed admitted, unless otherwise noted.

[2] The parties dispute whether the Group's physicians understood this policy to mean that only the CEO or President retained authority to alter the terms and conditions of their employment. *See* Pl.'s Resp. Def.'s Stmt. Material Facts ("RSOF") ¶¶ 12, 17, ECF No. 74.

Group for any reason; [and]

    (d)    The decision of the Shareholder to terminate his interest in the
           Group as a Shareholder[.]

*Id*. ¶¶ 19–20; Def.'s Ex. 2-C, Shareholder Agreement § 2, ECF No. 69-19.

**B.    Stankiewicz's Resignation**

Drawn by the promise of less crime and more employment opportunities, Stankiewicz and her husband decided to move from the Chicago area to Park City, Utah, in 2017. SOF ¶¶ 24–26. To that end, Stankiewicz emailed Susan Ruggio, the Practice Manager for the Group's Naperville office, on April 24, 2017. *Id* ¶¶ 27–29. In relevant part, Stankiewicz's email stated:

> I would like to send out emails to DMG headquarters and the office sometime this week. Preferably as early as tomorrow. Can you check these messages and let me know what you think the best procedure is? Who should I address this email to in headquarters?
> . . . .
>
> To DMG headquarters:
> It is with mixed emotions that I inform you of my exit from DuPage medical group. I am available to complete my duties here until the end of July. After this, my family and I will be moving to Park City, UT.

*Id*. ¶ 29. The next day, Ruggio replied:

> As far as DMG I would say Dennis [Fine, Chief Operating Officer] and Mike Kasper [Chief Executive Officer]. Do you have any obligation to the [B]oard? Maybe Dr. Merrick [President of the Board] would cover that portion. I would maybe check with Dr[.] Bhatia on that as I'm not sure.

Def.'s Ex. 2-D, 4/25/17 Email from S. Ruggio to K. Stankiewicz, ECF No. 69-20.

Later that day, Ruggio advised Stankiewicz that she had "talked to Dr. Bhatia

3

about who to send the letter to. He said to send it to him (as dept. chair and site leader I presume) and he will forward on." Pl.'s Ex. C-3, 4/25/17 Email from S. Ruggio to K. Stankiewicz, ECF No. 74-50; *see* Def.'s Ex. 1-A, Stankiewicz Dep. ("Stank. Dep.") at 71:4–72:6, ECF No. 69-2.

Consistent with Ruggio's instructions, Stankiewicz directed her resignation email message to Bhatia. SOF ¶ 32; *see* Def.'s Ex. 2-E, 5/1/17 Email from K. Stankiewicz to A. Bhatia, ECF No. 69-21. In turn, Bhatia transmitted that message to the Group's senior leaders. *See* Def.'s Ex. 2-F, 5/2/17 Email from D. Fine to B. Pearlman, ECF No. 69-22. Other Group employees apprised Stankiewicz's patients about her departure, advised hospitals and health plans that July 31, 2017 would be her last day, and arranged for her access to patient records to terminate on that date. SOF ¶¶ 35, 37–40.

## C. Stankiewicz's Attempt to Stay

That summer, Stankiewicz learned that the Group was planning to sell one of its assets to a private equity firm in the coming months. SOF ¶ 42. That transaction promised to dramatically increase the value of the Group's shares. RSOF ¶ 65. Indeed, Stankiewicz estimates that her 1,000 shares—for which she originally paid $11,000—would have been worth about $1 million after the transaction closed. *Id*.

So, a week before her scheduled departure, Stankiewicz asked Ruggio and Bhatia if it would be possible for her to stay through the end of August. *Id*. ¶ 47.

4

At that point, Ruggio began "notif[ying] all the departments [she] could think of by email." Pl.'s Ex. B-22, 7/25/2017 Email from S. Ruggio to C. Sagredo, ECF No. 74-36. For example, she sent an email blast informing dozens of the Group's employees that "Dr. Stankiewicz has decided to stay on until the end of August." *See* Pl.'s Ex. C-8, 7/24/2017 Email from S. Ruggio to B. Glisson, ECF No. 74-55. Bhatia then forwarded that email to Stankiewicz with the comment: "Looks like [Ruggio] made [the extension] happen!" SOAF ¶ 21.

Two days later, Ruggio told Stankiewicz that she could stay on through August 31, 2017. *Id*. ¶ 20. Specifically, Ruggio wrote:

> Glad you will be here for another month. I did submit everything to the appropriate parties with an end date of 8/31. I worked with Claudia Seg[r]ado the credentialing manager who walked me through the appropriate steps in notifying everyone of the change from 7/31 to 8/31.

*Id*. At the same time, other Group employees placed patients on Stankiewicz's August schedule, extended her malpractice insurance coverage, and notified hospitals and health plans about her new end date. *Id*. ¶¶ 19, 24, 26, 27, 45.

The next day, July 27, Stankiewicz emailed a notice to the Group's President and CEO asserting her right as a shareholder to dissent from the planned transaction. *Id*. ¶ 33. Four days passed. *Id*. ¶ 37. Finally, on July 31, the CEO sent Stankiewicz a message purporting to reject her offer to stay and stating that her

5

employment would end that day.³ *Id.* ¶ 37. The Group also deposited $11,000 in compensation for Stankiewicz's shares in her bank account, but she immediately returned the money. *Id.* ¶ 39. Convinced that the Group improperly prevented her from exercising her right to dissent, Stankiewicz filed his lawsuit.

## II. <u>Legal Standard</u>

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has carried this initial burden, the nonmoving party must then set forth specific facts demonstrating that there are disputed material facts that must be decided at trial. *Id.* at 321–22. The nonmoving party carries this ultimate burden where "a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir.

---

³   The parties dispute whether this means that the Group fired Stankiewicz or whether it simply adhered to the earlier agreement for Stankiewicz to resign as of July 31. *See* RSOF ¶ 63. To support its view, the Group points to Stankiewicz's deposition testimony that "the Group did not fire [her]." Pl.'s A-10, Stankiewicz Dep. at 250:7–17, ECF No. 74-11. But, read in context, that statement seems to refer to Stankiewicz's initial decision to resign, not to the CEO's July 31 email ending her employment.

2014). The Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

### III. <u>Analysis</u>

The Group maintains that it is entitled to summary judgment for four reasons: (1) it never agreed to extend Stankiewicz's employment beyond July 31, 2017; (2) it retained the right to redeem her shares on July 31 regardless of her departure date; (3) the doctrine of unclean hands bars Stankiewicz's claim; and (4) the statute of frauds prevents her from enforcing any modification to the Employment Agreement. The Court will address each argument in turn.

**A. Apparent Authority**

The central issue in this case is whether the parties agreed to postpone Stankiewicz's departure beyond July 31, 2017. If the Group extended Stankiewicz's employment through the end of August, then she likely had the right to dissent from the anticipated transaction, which was scheduled to close in the middle of that month. SOAF ¶ 40. But if the Group properly terminated Stankiewicz before that date, then she would not have enjoyed the right to dissent. *See* 3/8/19 Order at 8–10, ECF No. 48 (citing *Brynwood Co. v. Schweisberger*, 913 N.E.2d 150, 169 (Ill. App. Ct. 2009)).

At this stage, Stankiewicz does not dispute that the Group accepted her offer to resign on July 31, nor does she contest that no one with actual authority altered

7

that date.  *See* Pl.'s Resp. at 11, ECF No. 75.  Instead, she submits that Ruggio and Bhatia had apparent authority to accept her offer to stay beyond July 31.[4]

It is well-established under Illinois law that "[a] principal is bound not only by the authority that he actually gives another, but also by the authority he appears to give."  *Willmott v. Fed. St. Advisors, Inc.*, No. 05-cv1124, 2008 WL 2477507, at *7 (N.D. Ill. June 27, 2008) (cleaned up); *see, e.g.*, *Gilbert v. Sycamore Mun. Hosp.*, 622 N.E.2d 788, 795 (Ill. 1993)).  "Apparent authority arises where the principal creates, through words or conduct, the reasonable impression that the putative agent has been granted authority to perform certain acts."  *Id.* (cleaned up).

As particularly relevant here, "apparent agency may arise . . . from silence of the alleged principals when they knowingly allow another to act for them as their agent."  *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 859–60 (7th Cir. 2001) (applying Illinois law); *see, e.g.*, *Phillips v. Cmty. Ctr. Found. & Children's Farm*, 606 N.E.2d 447, 450–51 (Ill. App. Ct. 1992) ("Acquiescence by the principal in the conduct of the putative agent is sufficient to establish apparent authority."); *Hepp v. Ultra Green Energy Servs., LLC*, No. 13-cv-4692, 2016 WL 1073070, at *5 (N.D. Ill. Mar. 18, 2016) ("[A]pparent authority . . . may flow from a principal's general knowledge of and acquiescence to the routine conduct of its agent.").

---

[4]  Stankiewicz also argues that the Group ratified the agreement to postpone her end date.  But because (as the Court explains) a reasonable factfinder could conclude that Ruggio and Bhatia had apparent authority to accept Stankiewicz's proposal, the Court declines to reach this alternative argument.

8

*Phillips* illustrates this principle. The main question there was whether a groundskeeper employed by a community center possessed apparent authority to allow third-parties to handle the center's horses. 606 N.E.2d at 450. In the past, the groundskeeper had encouraged his friends and family to make use of the horses. Id. at 448–49. And, on a number of those occasions, the center's Executive Director was present and "did not say anything regarding the riding of the horses." *Id.* at 450. Because of the Director's prior acquiescence, the court held that "a reasonable person could conclude that . . . [the groundskeeper] had apparent authority" to permit outsiders to handle the horses even when the Director was not present. *Id.* at 451.

The same logic explains why Stankiewicz's apparent authority theory survives summary judgment. Like the Director in *Phillips*, the Group was informed of Stankiewicz's initial resignation and allowed Ruggio and Bhatia to alter the terms of Stankiewicz's employment. For example, when Stankiewicz resolved to resign, she notified Ruggio and Bhatia, not the Group's senior leaders. *See* SOF ¶¶ 27–29. In turn, Ruggio and Bhatia enlisted other Group employees in making the necessary arrangements, such as informing hospitals and rescheduling patients. *See id.* ¶¶ 35, 37, 39. Thus, just as the Director in *Phillips* stayed silent while the groundskeeper permitted others to handle the horses, so too did the Group acquiesce to Ruggio and Bhatia's acceptance of Stankiewicz's resignation.

In seeking to delay her departure, Stankiewicz followed the same steps. *Id.* ¶ 47. She notified Ruggio and Bhatia about her desire to stay. SOAF ¶ 20. And,

9

as before, they promptly indicated that Stankiewicz's request had been approved. *Id.* At the same time, Group administrators extended her malpractice insurance, IT access, and availability for patient scheduling. *See id.* ¶¶ 19, 24, 26–27. Those updates involved more than a half-dozen employees, hundreds of patients, and an expenditure of significant funds. Yet the Group's senior leaders knew of these developments but did nothing to intervene, at least until Stankiewicz submitted her notice of dissent. *Id.* ¶ 37. Taking into account the Group's silence in the face of this knowledge, along with its prior acquiescence to similar changes initiated by Ruggio and Bhatia, a reasonable trier of fact could conclude that Ruggio and Bhatia possessed apparent authority to postpone Stankiewicz's departure.[5]

None of the Group's counterarguments are persuasive. First, it submits that Stankiewicz knew that Ruggio and Bhatia lacked authority to extend her employment. *Cf. Cove Mgmt. v. AFLAC, Inc.*, 986 N.E.2d 1206, 1213 (Ill. App. Ct. 2013). ("If the third person knows . . . that the acts exceed the agent's powers . . . he cannot assert an apparent authority effective against the principal.") (cleaned up). To this end, the Group spotlights certain remarks Stankiewicz made during her

---

[5] In a footnote in its reply brief, the Group contends that Stankiewicz's complaint failed to allege that Bhatia had apparent authority and that she has therefore waived that argument here. Def.'s Reply at 4 n.5 (citing *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 861 (7th Cir. 2017)). By reserving this argument for its reply brief, however, the Group itself has waived it. *See Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("[A]rguments made for the first time in a reply brief are generally treated as waived."). Besides, Stankiewicz's argument about Bhatia's apparent authority is best understood as "an alternative legal characterization of the complaint's facts" rather than "a new fact" subject to waiver. *See Chessie*, 867 F.3d at 861 (cleaned up).

deposition. For instance, when asked whether "Bhatia was the one who gave you permission to stay," Stankiewicz replied, "I think that locally in our office before I would do anything, I would ask him. But ultimately, I think it was up to DMG headquarters." Stank. Dep. at 154:15–155:2. She made a similar comment about Ruggio, too. *See id.* at 161:2–6.

Those remarks are susceptible to two reasonable interpretations, only one of which supports the Group's request for summary judgment. One reading is that Stankiewicz believed that Bhatia and Ruggio exceeded their powers when they confirmed the extension. So understood, Stankiewicz's statements foreclose her apparent authority theory. But another reading is that the comments reflect a layperson's understanding of an agency relationship: Stankiewicz recognized "DMG headquarters" as the principal and viewed Bhatia and Ruggio as agents who were ultimately accountable to that principal. That would accord with Stankiewicz's prior experience, in which she directed her resignation to Bhatia and Ruggio, who in turn notified headquarters. Read that way, Stankiewicz's remarks are not inconsistent with her apparent authority theory.[6]

---

[6] The Group also cites a text message Stankiewicz sent to another doctor, which stated: "Just heard from the 'c-suite' that I'm not allowed to change my end date. Hahaha. As expected." Def.'s Ex. 1-J, Dr. Hsu Text Messages at 4, ECF No. 69-11. During her deposition, Stankiewicz clarified that she "expected" that the Group would try to prevent her from staying once she exercised her right to dissent, not that she expected that Ruggio and Bhatia lacked authority to allow her to stay. *See* Pl.'s Ex. A-10, Stank. Dep. at 181:21–183:19. Whether that explanation is credible is a questions for trial, not summary judgment.

11

Next, the Group faults Stankiewicz for ignoring the Employment Agreement. Under that Agreement, "[a]ll notices or communications to the medical group shall be delivered or mailed to the attention of its President and its Chief Executive." SOF ¶ 16. As the Group points out, there is no apparent authority when a principal has "consistently maintained that the only way in which it would enter a binding contract was through [an offer accepted] by [the principal]." *See Bethany*, 241 F.3d at 860 (discussing the context of purchase orders). But, when the record is construed in Stankiewicz's favor, the Notice Provision does not speak to the scope of Bhatia's or Ruggio's authority. Rather than requiring that the CEO and President approve all changes, it merely mandates that they receive certain notifications. And, based on Ruggio and Bhatia's representations, Stankiewicz reasonably assumed that they had advised the Group's officers about her delayed departure. *See, e.g.*, Pl.'s Ex. C-1, 4/25/17 Email from S. Ruggio to K. Stankiewicz. Thus, the Notice Provision leaves open the possibility that Stankiewicz reasonably believed that Ruggio and Bhatia had authority to extend her employment.

Equally unavailing is the Group's argument that Stankiewicz neglected to perform a "reasonable inquiry" into "the true state of the [agents'] powers." *Siena at Old Orchard Condo. Ass'n v. Siena at Old Orchard, LLC*, 75 N.E.3d 420, 444 (Ill. App. Ct. 2017). Considering Stankiewicz's April 24 email asking whom to contact at "Headquarters," together with the many indications that the Group had approved the extension (such as changes in IT access and patient scheduling), a reasonably

12

factfinder could conclude that Stankiewicz took reasonable steps to verify the scope of Ruggio's and Bhatia's authority. *See, e.g.*, SOF ¶¶ 27–29; SOAF ¶¶ 19, 24, 26.

Finally, the Group questions whether Stankiewicz detrimentally relied on Ruggio and Bhatia's representations that she could stay on until August 31, 2017. It is true that, without "detrimental reliance upon the agent's authority, there can be no apparent authority." *Cove*, 986 N.E.2d at 1213. But that principle does not help the Group here.

After the Group's administrators put hundreds of patients on her August calendar, Stankiewicz personally updated forty-nine of those patients' treatment plans. SOAF ¶ 27. That counts as detrimental reliance unless Stankiewicz would have made the same revisions (or expended similar effort on other Group work) regardless of her departure date. *See, e.g.*, *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 797 (N.D. Ill. 2010). Given that the patients had August appointments, a reasonable inference is that Stankiewicz would not have invested time updating their treatment plans unless she expected to stay given the news that she had received.

Ultimately, then, the Court cannot say that Stankiewicz's apparent authority theory fails as a matter of law. *Cf. Kaporovskiy v. Grecian Delight Foods, Inc.*, 787 N.E.2d 268, 272 (Ill. App. Ct. 2003) ("[T]he question of whether an agency relationship exists and the scope of the purported agent's authority are questions of fact."). Whether Bhatia and Ruggio had the authority to extend Stankiewicz's tenure beyond July 31 is a question that must be answered at trial.

13

## B. The Right to Redeem

In the alternative, the Group contends that it had the right to redeem Stankiewicz's shares on July 31, 2017 regardless of her end date. The Shareholder Agreement specifies that shares "shall be automatically redeemed . . . [upon] . . . [t]he decision of the Shareholder to terminate his interest in the Group as a Shareholder." Shareholder Agreement at 2–3. "Stankiewicz triggered [that provision]," the Group insists, "by making a 'decision' to terminate her interest as a shareholder in DMG when she tendered her notice of resignation." Def.'s Reply at 14, ECF No. 76. This is because the parties understood that, as a general matter, only employees can be shareholders. SOF ¶ 34.

This argument, however, overlooks the same series of events discussed above. Notably, while Stankiewicz may have known (and intended) in April 2017 that her status as a shareholder would end upon her departure as an employee on July 31, 2017, before that date came, she sought an extension of that date to August 31. And, as also discussed above, a reasonable jury could conclude that the Group—which knew that one's status as an employee and shareholder went hand-in-hand—agreed.

What is more, the Shareholder Agreement mandates that the Group "*promptly* pay the purchase price" of any redeemed shares. Shareholder Agreement at 2 (emphasis added). Yet even though Stankiewicz sent her resignation email in late April, SOF ¶ 29, neither the Group nor Stankiewicz took any steps to redeem her shares until July 31—more than three months later, and only after Stankiewicz had

14

challenged the transaction at issue, *id.* ¶¶ 64–65. These facts further support the conclusion that neither side believed that Stankiewicz's April resignation email automatically triggered the Group's ability to redeem her shares on July 31.

**C.     Unclean Hands**

The next question is whether the doctrine of unclean hands bars Stankiewicz's claim. That doctrine "bars relief when the party seeking that relief is guilty of misconduct in connection with the subject matter of the litigation." *Jameson Real Estate, LLC v. Ahmed*, 129 N.E.3d 128, 148 (Ill. App. Ct. 2018). In determining "whether a party acted with unclean hands, the court must look to the intent of the party." *Gambino v. Boulevard Mortg. Corp.*, 922 N.E.2d 380, 417 (Ill. App. Ct. 2009). Only when "[a] party's misconduct . . . rise[s] to the level of fraud or bad faith" will courts apply the doctrine of unclean hands. *Id.*

In the Group's view, Stankiewicz's hands are dirty because "she initiated a plan to cause DMG to extend her employment, without the knowledge or permission of DMG's Board or C-Suite, to reap a substantial financial gain." Def.'s Reply at 13–14. In support, the Group cites a text message in which Stankiewicz stated that the Group's senior leaders had finally "c[aught] on" to the planned extension. SOF ¶ 60. But while Stankiewicz recognized that the Group remained ignorant as to her plans, there is evidence in the record that she promptly informed her managers—her direct supervisor (Bhatia) and HR manager (Ruggio)—about her desire to stay. *Id.* ¶ 47. Given those facts, a reasonable juror could conclude that Stankiewicz did not

15

purposely conceal her plans in order to defraud the Group. The Court thus declines to grant summary judgment on this basis.

**D.     Statute of Frauds**

The Group also maintains that, even if it had agreed to extend Stankiewicz's end date, the Statute of Frauds prevents her from enforcing that agreement. As a general matter, the Statute of Fraud "function[s] . . . as an evidentiary safeguard" by requiring that certain contracts be made in writing. *McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347, 1351 (Ill. 1997). As relevant here, any contract "for a performance that cannot be completed within one year" must comply with the Statute.[7] *Swervo Entm't Grp. LLC v. Mensch*, No. 16-cv-4692, 2017 WL 1355880, at *6 (N.D. Ill. Apr. 13, 2017); *see* 740 Ill. Comp. Stat. 80/1.

In keeping with the Statute of Fraud's evidentiary function, a sufficient writing "need not itself be a valid contract, but only evidence of one." *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 549 (7th Cir. 2005) (applying Illinois law). As such, a sufficient memorandum may even "be composed of multiple documents of varying forms." *Id.* What matters is that "all the essential terms of the contract must be in writing, and there must be an express reference to the other writings or such a connection between the documents, physical or otherwise, as to demonstrate that they relate to the same contract." *Id.* (cleaned up).

---

[7]     For the purpose of resolving this summary judgment motion, the Court assumes (without deciding) that the modified Employment Agreement must comply with the Statute of Frauds.

16

Drawing all reasonable inferences in Stankiewicz's favor, a trier of fact could decide that her email exchanges with Ruggio and Bhatia satisfy the Statute's standards.[8] First, the content and context of those messages "demonstrate that they relate to the same contract," and the Group does not argue otherwise. *Id.*; *see* Def.'s Reply at 13–14. Second, contrary to the Group's suggestion, the emails document the essential terms of the alleged agreement, including the revised departure date, *see, e.g.*, Pl.'s Ex. C-9, 7/26/17 Email from S. Ruggio to K. Stankiewicz at 1, ECF No. 74-56, and Stankiewicz's plan to come into the office on certain days of the week, *see* Pl.'s Ex. B-8, 7/24/17 Email from S. Ruggio to S. McGuire at 2, ECF No. 74-22; Pl.'s Ex. C-8, Ruggio 7/24/17 Email from S. McGuire to S. Ruggio at 3, ECF No. 74-55.

Lastly, the Group argues that the emails fail to demonstrate a "meeting of the minds" between it and Stankiewicz. *Czerska v. United Airlines, Inc.*, 292 F. Supp. 2d 1102, 1119 (N.D. Ill. 2003). But that argument assumes that Ruggio and Bhatia lacked apparent authority to alter Stankiewicz's departure date. As noted above, that issue cannot be resolved as a matter of law. Thus, the Statute of Frauds does not necessarily foreclose Stankiewicz's claim.

## **Conclusion**

For the foregoing reasons, the Group's motion for summary judgment is denied.

---

[8] Whether a set of writings comports with the Statute of Frauds is generally a question of fact. *See, e.g.*, *Anderson v. Kohler*, 922 N.E.2d 8, 18 (Ill. App. Ct. 2009); *Passanante v. Callier*, 377 N.E.2d 1304, 1307 (Ill. App. Ct. 1978).

17

IT IS SO ORDERED.                    ENTERED      10/13/20

_____
**John Z. Lee**
**United States District Judge**